# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM GILSON,                     )
                                    )
                    Plaintiff,      )        Civil Action No. 1:12-cv-002
                                    )
v.                                  )        Judge Mark R. Hornak
                                    )
THE PENNSYLVANIA STATE POLICE,      )
an agency of the COMMONWEALTH of    )
PENNSYLVANIA, et al.,               )
                                    )
                    Defendants.     )

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiff William Gilson filed this civil action against the Pennsylvania State Police and certain of its present or former officers and officials[1] after he was terminated from his position as a Pennsylvania State Trooper. In this lawsuit, Gilson alleges that the Defendants violated his rights under the U.S. Constitution, federal and state employment discrimination laws, and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1334(b), and 1367.

Presently pending before the Court is Defendants' motion for summary judgment on all counts in Plaintiff's Fourth Amended Complaint (ECF No. 74), the operative pleading in this case. For the reasons that follow, Defendants' motion will be granted.

---

[1] The individual Defendants include Major (formerly Captain) Mark Schau, Sergeant Kyle Teter, Major Lisa Christie, Trooper William Sibbald, Jr., Debra Facciolo, and Commissioner Frank Noonon. Although Plaintiff originally named Mark Noce as a Defendant, he later dropped the claims against Noce in an amended pleading. Accordingly, Noce is no longer a party to this litigation.

# I. FACTUAL BACKGROUND

Plaintiff is a former Pennsylvania State Trooper who was employed by the Pennsylvania State Police (hereafter, "PSP") from 1994 to 2011. (PSAF ¶1.)[2] During his tenure with PSP, Plaintiff served at the Troop E Headquarters in Erie, Pennsylvania under his commanding officer, Captain Mark Schau (later Major Schau). (Id. ¶3.) Defendant William Sibbald, Jr. also served as a Pennsylvania State Trooper in Troop E, along with Plaintiff. (Id ¶2.)

According to Plaintiff, Trooper Sibbald harbored a personal animosity toward him as a result of Plaintiff having previously inquired into Sibbald's relationship with a female high school informant. (PSAF ¶24.) Plaintiff claims that Sibbald referred to him as a "freak" and a "pervert" in the presence of others and commented that Plaintiff "didn't belong on this job." (Id.)

## A. The August 17, 2009 Incident

On August 17, 2009, various PSP Troopers, including Plaintiff and Trooper Sibbald, were dispatched to assist in an incident involving the involuntary mental health commitment of a twenty-year old male who was acting erratically and threatening to harm himself. (PSAF ¶13.) Also present at the scene was a female crisis service worker by the name of Sandra Grgic. (Id. ¶14.) After the subject of the call was successfully handcuffed, Plaintiff and Grgic exited the premises. (Id. ¶¶17-18.)

What happened next is hotly disputed by the parties. Plaintiff maintains that he tapped the elbow of Grgic, who was walking in front of him, and inquired to which hospital the individual was being taken. (Declaration of William Gilson at ¶13, ECF No. 99-1.) Grgic told Plaintiff the name of the hospital, and Plaintiff then entered his vehicle and departed the scene. (Id. ¶¶14-15.) While Plaintiff acknowledges touching Grgic's elbow in order to get her attention,

[2] For purposes of this Memorandum Opinion, references to "PSAF ___" will refer to Plaintiff's Statement of Additional Facts (ECF No. 97) and Defendants' response thereto (ECF No. 104). "DSMF___" will refer to Defendants' Statement of Material Facts (ECF No. 82) and Plaintiff's responses thereto (ECF No. 96).

he denies any further physical contact between the two.  (Id. ¶¶16-17.)  According to Defendants, however, Plaintiff touched Grgic inappropriately during their brief verbal exchange by placing his left arm around Grgic's waist and pulling her toward himself.  (*See* Pl.'s Ex. 26, ECF No. 99-3; PSAF ¶35.)

Following this incident, Sibbald twice attempted, unsuccessfully, to reach Grgic at her place of employment.  (PSAF ¶¶ 23, 29.)   When the two subsequently spoke, Sibbald told Grgic that he had witnessed the incident, and he informed her that she could file a complaint about it if she wished to do so.  (PSAF ¶30.)  On August 24, 2009, Grgic called PSP to complain about Gilson's conduct.  (Id. ¶34.)

**B.**     **The Internal Affairs Division Investigation**

Sergeant Mark Noce, an investigator in PSP's Internal Affairs Division (IAD), was subsequently assigned to investigate the incident.   (PSAF ¶47.)   In the course of his investigation, Noce twice interviewed Grgic, who (according to Noce) "related that the contact was not appropriate, [was] unwanted, and [occurred] on a personal area of her body (above her left hip on her waist)."   (Pl.'s Ex. 26, Attachment 10, ECF No. 99-3; Def.s' Resp. to PSAF ¶35, ECF No. 104.)

Noce also interviewed Plaintiff on two occasions -- October 26 and November 18, 2009.  (PSAF ¶52.)  During the course of his interviews, Noce repeatedly asked Plaintiff about the incident in question and Plaintiff repeatedly denied any wrongdoing, consistently maintaining that he had only touched Grgic on the elbow.  (PSAF ¶¶ 59-60.)  Noce described these exchanges in his report as follows:

- "You didn't touch her on the left waist area?"  Trooper GILSON said he at "no time" touched Ms. GRGIC on her left waist area and at no time did he move her in towards his body at all.  (Pl.'s Ex. 26, p. 9 of 22.)

- Sergeant NOCE: I said to Trooper GILSON that at no time did he reach with his left hand or arm and put it around her left waist area and pull her towards him, so they were touching body to body as Ms. GRGIC alleged. Trooper GILSON said that was correct. (Id. at p. 13 of 22.)

- Sergeant NOCE: I asked Trooper GILSON what his answer was … If he did not remember doing it or he did not do it. Trooper GILSON stated, "I did not do it." He said he did not touch her as far as putting his arm around her waist and he did not pull her into him under any circumstances. (Id. at p. 14. of 22.)

- I asked Trooper GILSON if he was denying touching Ms. GRGIC anywhere other than the elbow. Trooper GILSON advised he did not remember pulling Ms. GRGIC to him or reaching around her waist. (Id. at p. 17 of 22.)

- I asked Trooper GILSON if there was any physical contact of Ms. GRGIC other than the right elbow that he had previously said. Trooper GILSON stated, "No Sir, I do not, I do not, recall her, her side of the story (unintelligible) at all Sir." (Id. at p. 18 of 22.)

- I asked Trooper GILSON if he grabbed Ms. GRGIC by the left side of her body and pull her into his body. Trooper GILSON stated, "No I did not." (Id. at pp. 18-19 of 22.)

- After further discussion, I asked Trooper GILSON if he disagreed with how it was alleged he touched Ms. GRGIC. Trooper GILSON said, "That is correct Sir." (Id. at pp. 20-21 of 22.)

Noce also interviewed others present on the scene or nearby, including the parents and neighbors of the individual who was involuntarily committed and other PSP Troopers who had been dispatched to assist in the incident. (PSAF ¶52.) None of these other individuals witnessed contact between Plaintiff and Grgic. (Pl.'s Ex. 26.) The only other witness to the incident was Sibbald, who generally corroborated Grgic's version of the incident, except that Sibbald claimed that Grgic "quickly pushed herself away" from Plaintiff, whereas Grgic indicated in her verified statement that she merely "walked away." (See Pl.'s Ex. 26 at Attachment 3 and Attachment 10.)

### C.    The December 2009 Summary Report and Disciplinary Action Report

On November 23, 2009, Noce generated a report of his investigation which was forwarded to Schau in his capacity as Plaintiff's commanding officer. (PSAF ¶63.) Schau then

prepared a summary of the investigation, entitled "Summary Report," which he issued to Plaintiff on December 8, 2009. (Pl.'s Ex. 27, ECF No. 99-3; Schau Dep. 90:7-25, ECF No. 99-4.) In his Summary Report, Schau noted that the "crux of the investigation focuse[d] around a complaint that TFC GILSON while on-duty had inappropriate physical contact with a female crisis services worker." (Pl.'s Ex. 27, ECF No. 99-3.) The Summary Report included Schau's determination that the allegation against Plaintiff had merit and that, as a result, Schau was considering the issuance of a Disciplinary Action Report. (Id.; PSAF ¶64.)

As Schau explained, the purpose of the Summary Report was to put Plaintiff on notice that he was the subject of a complaint that might result in discipline. (Schau Dep. 90:21-25.) When Schau met with Plaintiff on December 8, 2009, he provided Plaintiff a copy of the IAD investigatory file, including any attachments, interviews and CDs, along with the Summary Report. (Schau Dep. 90:8-14; 91:1-5.) Pursuant to PSP procedure, a Trooper under investigation is given a chance to review the Summary Report and accompanying investigatory file and must then indicate, within a three-day period, whether he or she wants an opportunity to be heard at a pre-disciplinary conference or "PDC." (Id. at 91: 8-13.) At the PDC, the Trooper can ask questions and/or point out inconsistencies in the evidence or mitigating factors to the PSP Captain, who then makes the final determination whether the allegation of misconduct will be sustained. (Id. at 91:16-25.) In Plaintiff's case, Schau met with Plaintiff briefly on December 8, 2009 in order to provide him a copy of the Summary Report and Noce's investigative file. (Arbitration Hr'g Tr. 91:15-25, Jan. 6, 2011, Defs. Ex. D, ECF No. 83-2.) During this meeting, Schau asked Plaintiff if he wished to have a union representative present and Plaintiff indicated he did not, because he wanted to keep the incident quiet. (Id.)

Schau then scheduled a pre-disciplinary conference for December 11, 2009. Because he had to be out of town on that date, Schau arranged for Operations Lieutenant Bradley Allen to

meet with Plaintiff for his PDC. (PSAF ¶70; Schau Dep. 92:1-5.) Although not personally present, Schau had authored a Disciplinary Action Report ("DAR") to be issued against Plaintiff in the event that Plaintiff "did not bring anything forward" at his PDC. (PSAF ¶71; Schau Dep. 92:6-93:7.) Schau instructed Allen that, if Plaintiff had "something to offer," then the DAR should not be issued, and Schau would consider "whatever [Plaintiff] brought forward" upon his return. (Schau Dep. 92:16-23.) According to Schau, Allen issued the DAR to Plaintiff on December 11 after determining that Plaintiff had nothing to offer concerning his alleged misconduct. (PSAF ¶72; Schau Dep. 92:6-93:7; Arbitration Hr'g Tr. 91:1-14, Jan. 6, 2011, ECF No. 83-2.) In relevant part, the DAR stated:

> [t]he investigation revealed that Trooper First Class William L. GILSON while speaking with a crisis services worker grabbed her by the waist pulling her against him. The physical contact was inappropriate, unwanted and against a personal area of her body. This behavior was also witnessed by another member. I have determined the allegation of improper On-Duty Conduct against you is sustained. You were also found to be less than truthful during several administrative interviews conducted during this investigation.

> In accordance with the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, all information, evidence, and statements used in my decision to issue the D.A.R. were furnished to you in a Summary report on December 8, 2009.

(Pl.'s Ex. 29, ECF No. 99-3.)[3]

On December 17, 2009, the DAR was forwarded by Schau's commanding officer, Major Terry L. Seilhamer, to the PSP Deputy Commissioner of Administration and Professional Responsibility for further action. (PSAF ¶83.) In a memorandum of that same date, Seilhamer documented his concurrence with Schau's determination sustaining the allegation of misconduct.

---

[3] Plaintiff maintains that this DAR constituted his "first notice" that he had been "disciplined for [his] conduct during the investigation." (Gilson Decl. ¶28.) He further objects that he was not given "all information, evidence, and statements used in [the Troop Commander's] decision to issue the D.A.R.," to the extent he was not provided the CD of all recorded interviews or a copy of Noce's interview transcript with Amanda Parker. (Gilson Decl. ¶32 (alteration in the original).)

(Pl.'s Ex. 28, ECF No. 99-3.)  Seilhamer found the evidence of inappropriate physical contact to be "overwhelming."  (Id.)  He concluded that Plaintiff had "obviously lied to the investigator regarding his misconduct," (id.), and he noted that Plaintiff "was the subject of a previous IAD investigation … which was sustained and in which he was found to be less than truthful."  (Id.)  Despite these events, Plaintiff was not immediately removed from his position as a State Trooper or restricted in his job duties; in fact, he continued to serve as a Trooper until November 16, 2010.  (Id. ¶¶ 29-30.)

### D. The Referral of Noce's Investigatory Report to the EEOO

In March of 2010, PSP's Department Discipline Office in Harrisburg forwarded the IAD Investigatory Report for further review to PSP's Equal Employment Opportunity Office ("EEOO").  (PSAF ¶85.)   Sergeant Kristal M. Turner-Childs was tasked with determining whether Gilson's alleged misconduct violated PSP's internal regulations prohibiting "sexual misconduct"[4] and/or "sexual harassment."[5]

---

[4] Under the applicable PSP regulations, "sexual misconduct" was defined to include:

> ... any uninvited or unwelcome sexual touching, sexual contact, or conduct of a sexual nature which victimizes another.  Sexual touching or sexual contact includes intentional touching or other physical contact of a sexual nature, done either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person.  Sexual misconduct also includes those types of conduct (whether or not criminally charged) which are described in the sexual offenses subchapter of the Crimes Code, as defined in Title 18 Pa. C.S. Section 3121, Rape; section 3122.1, Statutory sexual assault; Section 3123, Involuntary deviate sexual intercourse; Section 3124.1, Sexual assault; Section 3124.2, Institutional sexual assault; Section 3125, Aggravated indecent assault; Section 3126, Indecent assault; Section 3127, Indecent exposure; Section 3129, Sexual intercourse with animal; as well as Section 5901, Open lewdness; Section 6301, Corruption of minors (but only as it relates to acts of a sexual nature); and equivalent offenses committed (whether or not criminally charged) in other jurisdictions.

(PSAF ¶¶ 86-87; Pl.'s Ex. 77, §1.38, ECF No. 99-3.)

[5] Under the applicable PSP regulations, "sexual harassment" was defined to include:

> unwelcome sexual advances; requests for sexual favors; and/or other verbal, visual, or physical conduct of a sexual nature (whether or not criminally charged), where any or all of the following occur:

In a memorandum dated March 2, 2010, Turner-Childs opined that Plaintiff had violated PSP's regulations prohibiting its police officers from engaging in sexual misconduct and sexual harassment.  (Pl.'s Ex. 99, ECF No. 99-3.)  In a subsequent memorandum dated June 8, 2010, Lt. Turner-Childs concluded that Plaintiff had violated PSP's policy against harassment.  Turner-Childs reasoned that:

> …Sexual misconduct includes any uninvited or unwelcome sexual touching, sexual contact, or conduct of a sexual nature which victimizes another.  Sexual touching or sexual contact includes intentional touching or other physical contact of a sexual nature, done either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person.  Prohibited harassment shall also include inappropriate behavior with any persons whom Department personnel may interact with as a result of work-related business or assignments.  It is my belief that Trooper GILSON while in uniform and on duty, grabbed Ms. Sandra GRGIC, crisis worker by the left hip/waist area and pulled her against him.  Ms. GRGIC immediately pulled herself away from Trooper GILSON.  Ms. GRGIC reported the physical contact she received was inappropriate, unwanted and on a personal area of her body.

(Pl.'s Ex. 99, ECF No. 99-3.)

### E.    The November 9, 2010 Notice of Disciplinary Penalty

In light of Turner-Child's Memorandum, PSP's Department Discipline Office determined that Plaintiff had committed the offenses of "Discrimination and Harassment," in violation of Field Regulation (F.R.) 1-1.25, and "Sexual Impropriety," in violation of F.R. 1-1.38.  (Pl.'s Ex. 35, ECF No. 99-3.)  On December 9, 2010, after reviewing Plaintiff's case and consulting with Major Lisa Christie, Sergeant Kyle R. Teter of PSP's Department Discipline Office issued a

---

1.  Submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of an individual's employment.

2.  Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individuals.

3.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

(PSAF ¶91; Pl.'s Ex. 77, §1.38, ECF No. 99-3.)

Notice of Disciplinary Penalty stating that Plaintiff would be terminated from his job and immediately suspended without pay pending the outcome of any arbitration proceedings. (Id.; PSAF ¶4.) As set forth in the notice, Plaintiff was found to have violated seven PSP field regulations ("F.R.'s") – namely: (1) F.R. 1-1.02, "Unbecoming Conduct," (2) F.R. 1-1.28, "Internal investigations," (3) F.R. 1-1.25, "Discrimination or Harassment," (4) F.R. 1-1.38, "Sexual Impropriety," (5) F.R. 1-2.02, "Performance of Duty," (6) F.R. 1-2.05, "Competency," and (7) F.R. 1-2.30, "Providing False Information." (PSAF ¶110; Pl.'s Ex. 35, ECF No. 99-3.)

Plaintiff received the Notice of Disciplinary Penalty on November 15, 2010. (PSAF ¶109.) Thereafter, he initiated grievance arbitration proceedings.

## F.     The Arbitration Proceedings

On January 6, 2011, arbitration proceedings were held before Arbitrator Steven M. Wolf, Esq. (PSAF ¶122.) At the hearing, PSP asserted that, "[b]ecause Trooper Gilson lied about the incident numerous times during his IAD interview, the State Police has charged him with a serious act of deception." (PSAF ¶117.) PSP's counsel therefore framed the relevant issue as "whether the grievant committed a serious act of deception during an Internal Affairs investigation in violation of Article 26." (Id.)

Under the terms of the parties' collective bargaining agreement ("CBA"), a "serious act of deception" was one of the so-called 12 "deadly sins" that would warrant termination without consideration of mitigating circumstances. (Pl.'s Ex. 104, ECF No. 99-3; PSAF ¶115.) The specific infraction was defined in the CBA appendix as "[t]he commission of a serious act of deception during a criminal, civil or administrative investigation or proceeding, when under a specific, official obligation to be truthful, involving intentional (1) lying; (2) fabrication; (3) misleading acts or words; (4) civil or criminal fraud; or (5) perjury." (Pl.'s Ex. 104; PSAF

¶116.)   It is undisputed that the November 9, 2010 Notice of Disciplinary Penalty did not expressly reference the CBA's "serious act of deception" provision.[6]

At the hearing, PSP's lawyer represented that, "[a]lthough we consider Trooper Gilson's act of pulling Sandra Grgic to him in an embrace … as very serious, it is the serious act of deception here which is the primary focus of the case and which has resulted in Trooper Gilson's dismissal." (PSAF ¶125; Arb. Hr'g Tr. at 12:4-8, Jan. 6, 2011, ECF No. 99-13.)  To that end, PSP elicited testimony from Noce concerning the fact that Plaintiff had repeatedly denied touching Grgic inappropriately on August 17, 2009.  (PSAF ¶124.)  Although Plaintiff claims that he and the union's arbitration lawyer were surprised by PSP's position and were unprepared to defend against the "serious act of deception" accusation, there is no indication in the arbitration record that either Plaintiff or the union's lawyer ever raised any objection along these lines.

On May 4, 2012, Arbitrator Wolf issued his opinion and award in favor of PSP.  (PSAF ¶131, Pl.'s Ex. 41, ECF No. 99-3.)  The arbitrator concluded that the "heart" of the case concerned "the presence or absence of a 'serious act of deception.'"  (Pl.'s Ex. 41 at p. 12, ECF no. 99-3.)  Although the union had "suggest[ed] that this phrase is ambiguous," Arbitrator Wolf felt it "prudent to conclude that a State Trooper's conscious choice to fabricate testimony well over a dozen times during the course of an IAD investigation (most of those times being conclusive, but on occasion equivocating by not recalling) constitutes a 'serious act of deception.'"  (Id.; PSAF ¶133.)  Moreover, the arbitrator concluded that, under the terms of the governing CBA, Plaintiff's generally favorable work record could not be considered as a basis for mitigating his dismissal.   After acknowledging evidence concerning Plaintiff's positive

---

[6] However, as noted above, it did specifically reference the PSP Field Regulation proscribing providing false information.

performance evaluations and the recognitions he had received for commendable actions on the job, Arbitrator Wolf concluded that:

> [the union's] evidence here is trumped by Appendix E's unequivocal language providing that, when a "deadly sin" is established, "the proper level of discipline is termination of employment, notwithstanding any mitigating circumstances." Given my finding above of a "serious act of deception" on the part of the grievant, Appendix E therefore expressly requires me to find that PSP's dismissal of the grievant was proper.

(Pl.'s Ex. 41 at p. 12, ECF No. 99-3; *see* PSAF ¶134.).)

**G.    Post-Arbitration Events**

On May 4, 2011, Christie drafted a memo to Schau and Plaintiff regarding the "Imposition of Arbitration Award." (PSAF ¶159.)   In relevant part, the memorandum stated:

1. A Disciplinary Action Report was issued to Trooper William L. Gilson on December 11, 2009 …. It was determined that the actions of Trooper Gilson in this matter was [sic] in violation of the following Field Regulations:

| SECTION | TITLE |
|---|---|
| F.R. 1-1.02, | Unbecoming Conduct |
| F.R. 1-1.28, | Internal Investigations |
| F.R. 1-1.35, | Discrimination or Harassment |
| F.R. 1-1.38, | Sexual Impropriety |
| F.R. 1-2.02, | Performance of Duty |
| F.R. 1-2.05, | Competency |
| F.R. 1-2.30, | Providing False Information |

2. On October 7, 2010, Trooper Gilson was notified he was accused of offenses which would subject him to court-martial proceedings and that he could challenge said accusations through court-martial proceedings or the grievance procedure. Trooper Gilson elected the grievance procedure.

3. On November 15, 210, Trooper Gilson was notified that … he was to be dismissed from the Pennsylvania State Police, and remain in a suspension without pay status pending the filing of a grievance, and if applicable, a subsequent decision by an arbitrator.

4. Trooper Gilson grieved the dismissal penalty and on January 6, 2011 an arbitration hearing was held. The arbitration award, dated May 2, 2011, denies Trooper Gilson's grievance. Therefore, the resolution of charges against Trooper Gilson has been concluded and the following action is taken:  by the authority of the Commissioner of

> the Pennsylvania State Police, Trooper Gilson shall be dismissed from the Pennsylvania State police effective midnight, May 2, 2011.

(Pl.'s Ex. 42, ECF No. 99-3.)

On September 19, 2011, Christie's memorandum was forwarded to the Pennsylvania Department of Labor and Industry ("L&I") by Debra Facciolo, PSP's Director of Human Resource Management Division in the Bureau of Human Resources. (Pl.'s Ex. 92, ECF No. 99-3.) At the same time, Facciolo also forwarded copies of the arbitrator's award and the November 9, 2010 Notice of Disciplinary Penalty. (Id.)

Plaintiff claims that he had a number of promising job interviews following his termination as a State Trooper, but several prospective state agency employers who initially planned to hire him later refused to do so as a result of PSP's publication to L&I of Christie's May 4, 2011 memorandum. According to Plaintiff, publication of Christie's memorandum by its transmittal (along with the arbitration award) to the Department of Labor and Industry gave prospective employers the false impression that Plaintiff had been fired for committing sexual harassment and sexual impropriety and that these charges had been sustained by the arbitrator.

## II.   PROCEDURAL BACKGROUND

Based on the foregoing events, Plaintiff filed this civil action January 6, 2012. Following extensive pretrial proceedings, Plaintiff filed his Fourth Amended Complaint ("FAC," ECF No. 74) against PSP, Commissioner Frank Noonan, Major Schau, Sergeant Teter, Major Christie, Trooper Sibbald, and Ms. Facciolo.

The FAC sets forth thirteen (13) separate causes of action. Count 1 asserts a claim against Schau, Teter, Christie, and Sibbald for alleged violations of Plaintiff's procedural due process rights based on the Defendants' respective roles in Plaintiff's investigatory and termination proceedings. Count 2 asserts a claim against these same Defendants for the alleged

violations of Plaintiff's equal protection rights based on Plaintiff's gender. Count 3 alleges that these same Defendants conspired to deny Plaintiff's equal protection rights. In Count 4, Plaintiff asserts a claim against PSP for the alleged violation of his rights under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Counts 5 and 6 assert Pennsylvania state law claims against Sibbald for defamation and intentional infliction of emotional distress, respectively. Counts 7 and 8 assert claims against PSP for alleged gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). These claims are premised on theories of discriminatory discharge (Count 7) and hostile work environment (Count 8). Counts 9 and 10 set forth similar claims against Teter and Sibbald for alleged gender-based employment discrimination in violation of the Pennsylvania Human Relations Act ("PHRA"). Count 11 asserts a due process claim against Schau, Teter, and Christie under the theory that the term "serious act of deception" was unconstitutionally vague, both on its face and as applied to him personally. In Count 12, Plaintiff asserts a due process claim against Schau, Teter, Christie, Facciolo, and Noonan premised on the theory that these Defendants deprived Plaintiff of his protected liberty interest in future employment when they published information about his termination proceedings. Count 13 alleges a due process claim against these same individuals based on the theory that Plaintiff was deprived of his constitutionally protected interest in his employment, without due process of law, when PSP pursued the "serious act of deception" charge at the arbitration proceeding without having provided him any prior notice of this particular charge.

On January 30, 2015, Defendant filed the pending motion (ECF No. 80) and supporting materials (ECF Nos. 81, 82, and 83) requesting summary judgment on all counts in the FAC. Plaintiff filed his materials in opposition to the pending motion (ECF Nos. 96, 97, 98, and 99) on

April 9, 2015.[7]  Defendants filed their materials in reply to Plaintiff's position (ECF No. 104, 105) on May 7, 2015.  As a result of these filings, the issues raised in Defendants' motion are adequately joined and ripe for disposition.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  An issue is genuine only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party."  *Emerson Radio Corp. v. Orion Sales, Inc*., 253 F.3d 159, 162 (3d Cir. 2001).  "When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties."  *Am. Eagle Outfitters v. Lyle & Scott Ltd*., 584 F.3d 575, 581 (3d Cir. 2009) (alteration and internal quotation marks omitted).  "To defeat a motion for summary judgment, the nonmoving party must raise more than some metaphysical doubt as to the material facts, and the court must determine that a fair-minded jury could return a verdict for the nonmoving party on the evidence presented."  *Doe v. Luzerne Cnty*., 660 F.3d 169, 175 (3d Cir. 2011) (internal citations, alterations, and quotation marks omitted).

---

[7] In his brief, Plaintiff indicates that he does not oppose Defendants' motion insofar as it relates to Counts 3, 5, and 6 of the FAC.  (*See* Pl's Mem. Law Opp. Defs.' Mot. Summ. J. at 3, n. 2, ECF No. 98.)  Accordingly, the Court will grant judgment in favor of Defendants on Counts 3, 5 and 6 without further discussion in this Memorandum Opinion.

IV. **DISCUSSION**

A. **Plaintiff's Claims Under 42 U.S.C. 1983**

Many of the claims in the FAC pertain to alleged violations of Plaintiff's rights under the U.S. Constitution. Pursuant to 42 U.S.C. §1983,[8] a plaintiff has a private right of action to redress the violation of his federal constitutional rights, provided he can prove: (1) the violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Here, there is no dispute that the named Defendants acted at all relevant times under color of state law, so the Court will focus its inquiry on whether Plaintiff has identified sufficient record evidence that the named Defendants violated his federal constitutional rights.

To the extent a constitutional deprivation can be shown, the Court must also consider whether there is sufficient personal involvement on the part of each Defendant identified in Plaintiff's §1983 claims to support constitutional liability. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'")(quoting *Rode v. Dellarciprete*,

---

[8] Section 1983 provides a private right of redress as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]

42 U.S.C.A. § 1983.

845 F.2d 1195, 1207 (3d Cir. 1988)) (alteration in the original).  With these principles in mind, the Court will examine Plaintiff's various theories of §1983 liability.

### 1.    *Plaintiff's Procedural Due Process Claims Premised on Unfair Termination Proceedings (Counts 1 and 13)*

In Count 1 of the FAC, Plaintiff claims that Schau, Teter, Christie, and Sibbald, by virtue of their respective roles in Plaintiff's investigatory and disciplinary proceedings, deprived him of constitutionally protected interests in his reputation and in continued employment without due process of law.  Plaintiff alleges that Teter failed to properly review exculpatory evidence during the course of the investigation and also failed to properly consider and/or develop possible motives on the part of Grgic and Sibbald for making false accusations against him.  (FAC ¶¶174-76.)  Plaintiff accuses Schau, Teter and Christie of failing to conduct the investigation in a timely manner and failing to produce sufficient evidence of an inappropriate touching or other misconduct on his part.  (Id. ¶¶ 177-79.)  Plaintiff accuses all four Defendants collectively of over-penalizing him for a minor infraction, unfairly punishing him for defending himself, and "unfairly brand[ing]" him a liar and sexual harasser.  (Id. ¶¶ 194-96.)[9]

In Count 13 of the FAC, Plaintiff asserts a procedural due process claim against Schau, Teter, Christie, Facciolo, and Noonan premised on the theory that these Defendants unconstitutionally deprived Plaintiff of his protected property interest in continued employment by pursuing the "serious act of deception" charge at the arbitration hearing without prior notification to Plaintiff.  (FAC ¶¶459-61.)  Plaintiff claims that, due to the lack of proper notice,

---

[9] Plaintiff also faults the arbitrator for various errors that allegedly occurred during the arbitration process, and he criticizes the arbitration award as "arbitrary and capricious" and "biased."  (*See generally* FAC ¶¶ 180-93.)  Because a § 1983 claim must be premised on the personal involvement of the individual defendant in the alleged constitutional violation, *see Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir. 2005), Plaintiff's complaints about the arbitrator's conduct in arbitration proceedings cannot serve as a basis for liability on the part of any of the individuals named as Defendants in Count 1.  Further, and importantly, as noted below, the "process" provided to Plaintiff under Pennsylvania law gave him the unfettered right to raise exactly these challenges to the arbitration proceeding by seeking review of the arbitrator's award by the Pennsylvania Commonwealth Court.

he was unable to properly defend himself against the charge that he had engaged in a "serious act of deception" at any point during the termination proceedings, including at the arbitration hearing. (Id. ¶472.)

In his brief in opposition to summary judgment, Plaintiff articulates a slightly different version of these claims under three (3) distinct theories. He first argues that Schau's Summary Report was constitutionally insufficient because it did not provide him notice of all of the charges against him. In particular, Plaintiff maintains that the report failed to formally advise him that he could be disciplined for his conduct during the investigation – namely, repeatedly denying that he had touched Grgic inappropriately. Plaintiff objects that, despite this deficiency in Schau's Summary Report, he was later "disciplined" on December 11, 2009 (by virtue of Schau's DAR) in part for being "less than truthful" in his two interviews concerning his contact with Grgic.

Plaintiff next maintains that PSP violated his rights in connection with Teter's November 2010 Notice of Disciplinary Penalty. According to that document, Plaintiff was fired for having violated seven (7) PSP regulations, including "Internal Investigations," "Providing False Information," "Discrimination or Harassment," and "Sexual Impropriety." Here again, Plaintiff argues that, prior to receiving this "discipline," he never received notice of, or an opportunity to respond to, the charges stemming from his conduct during the IAD investigation, including his alleged violations of PSP's regulations governing "Internal Investigations" or "Providing False Information." In addition, Plaintiff objects that he never received pre-discipline notice that he was or would be charged with sexual harassment under PSP's "Discrimination or Harassment" regulation or sexual misconduct under PSP's "Sexual Impropriety" regulation. As a result, Plaintiff argues, he never had an opportunity to rebut these "highly charged" violations prior to

PSP's issuance of the dismissal notice.  (Pl.'s Mem. Law. Opp. Defs.' Mot. Summ. J. at 7, ECF No. 98.)

Finally, Plaintiff reiterates his theory that PSP denied him an opportunity to be heard "at a meaningful time and in a meaningful manner," (*see* Pl.'s Br. Opp. at 8, (citing *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)), when, at the arbitration hearing, it pursued the accusation that Plaintiff had engaged in a "serious act of deception."  Plaintiff points out that Teter's Notice of Disciplinary Penalty did not make any specific reference to a "serious act of deception," which constitutes one of the twelve (12) "deadly sins" in the CBA, resulting in automatic termination.  Plaintiff maintains that this particular charge was qualitatively different from the violation of an internal regulation, because it did not permit consideration of any mitigating circumstances.  Plaintiff insists that, because he did not have prior notice of this particular charge, he and arbitration counsel were not prepared to defend against it, resulting in a denial of his constitutional right to be heard at a meaningful time and in a meaningful manner.

The Fourteenth Amendment to the U.S. Constitution provides that a State may not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, §1.  To successfully state a procedural due process violation, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"  *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d. Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *see Emigh v. Steffee,* Civil Action No. 08–1726, 2009 WL 1472916, at *10 (W.D. Pa. May 27, 2009), aff'd, 442 F. App'x 660 (3d Cir. 2011).  Here, Plaintiff alleges that he had a constitutionally protected property interest in his continued employment.  (FAC ¶164.)  Defendants do not dispute this

allegation, so the question becomes whether Plaintiff was deprived of that interest without "due process of law."

Our Court of Appeals has held that, where a plaintiff has a property interest in employment, due process generally requires a pre-deprivation hearing. *Schmidt v. Creedon*, 639 F.3d 587, 595–97 (3d Cir. 2011). In *Schmidt,* that Court explained that:

> [o]rdinarily, a pre-deprivation hearing "need not be elaborate." [*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)]. Where adequate post-deprivation procedures are available, an employee is entitled only to "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. The hearing can be informal and "need not definitively resolve the propriety" of the deprivation. *Id*. "It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id*. An employee is generally not entitled to notice of the reasons for his discharge in advance of a pre-deprivation hearing, G*niotek* [*v. City of Phila*., 808 F.2d 241, 244 (3d Cir. 1986)], or to present his case to an impartial decision-maker at such a hearing, *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995).

*Schmidt,* 639 F.3d at 596-97.

Here, Plaintiff does not dispute that he received both a pre-termination notice of misconduct (i.e., Schau's Summary Report) and a pre-termination informal hearing (i.e., the pre-disciplinary conference with Allen on December 11, 2009). Nevertheless, he insists that these measures were constitutionally insufficient because they failed to notify him of *all* the relevant charges against him – that is, Plaintiff claims he never got pre-discipline notice that he might be punished for: (1) his repeated denials of inappropriate contact with Grgic during the IAD investigation, or (2) allegedly committing sexual harassment or sexual misconduct.

Having thoroughly reviewed the record in this case, the Court is not persuaded that Plaintiff has demonstrated the existence of a genuinely disputed issue of material fact relative to his procedural due process claims. In judging the sufficiency of Plaintiff's pre-discipline process, the Court finds it relevant to consider not only the information provided in Schau's

summary report, but also the evidence pertaining to Noce's investigation. *See Leader v. Noonan,* No. 1:12-cv-2570, 2014 WL 3557105, at *5 (M.D. Pa. July 17, 2014) ("[T]he Third Circuit has made it clear that a *formal* hearing, such as the [Pre-Disciplinary Conference] … is not required pre-suspension in order to satisfy due process.") (citing *Schmidt,* 639 F.3d at 596) (emphasis in the original). Here, it is undisputed that Noce interviewed Plaintiff twice during the investigatory process. At the time of his first interview on October 26, 2009, Plaintiff was given a written notice of Grgic' allegation that Plaintiff had touched her in a nonconsensual fashion by putting his left hand or arm around her left waist area and pulling her to his body. (See Pl.'s Ex. 26, Attachment 13, ECF No. 99-3.) Plaintiff was advised that Grgic considered the contact to be inappropriate, unwanted, and on a personal area of her body. (*Id.*) Before being questioned about the incident, Plaintiff was further advised, both orally and in writing that, "[s]ince this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action." (Pl.'s Ex. 26, Attachment 12, ECF No, 99-3; Pl.'s Ex. 86, p. 1, ECF No. 99-3.) Plaintiff received the same written warning at the time of his second IAD interview on November 18, 2009. (Pl.'s Ex. 26, Attachment 12, ECF No. 99-3.) During the course of his investigatory interviews, Plaintiff was confronted with the evidence against him, which consisted chiefly of Grgic's account of the incident and Sibbald's corroborating account. (*See generally* Pl.'s Ex. 26.) Noce specifically inquired about whether either witness might have a motive to be untruthful about their accounts. Plaintiff responded that he and Sibbald were not friends and that Sibbald had "burned" other troopers with regard to "how he words things." (Id. at pp. 17, 19.) Plaintiff could provide no explanation as to why Grgic would fabricate her allegations. (Id. at pp. 4, 13.) Plaintiff was asked on numerous occasions during the interview whether he touched Grgic as alleged, and he

consistently denied doing so, even to the point of stating that Grgic must not have been telling the truth. (Id. at pp. 13, 19.)

At the time he received Schau's Summary Report of the investigation, Plaintiff also received a copy of Noce's IAD file, which included detailed information about all of the interviews Noce had conducted concerning the incident. Again, this included Grgic's statements that the touching was not appropriate, unwanted, and on a personal area of her body, consistent with "how a man would hold his wife or someone he knew." (Ex. 26, Attachment 10.) Plaintiff was given several days to review this material before meeting with Allen on December 11, 2009 for his pre-disciplinary conference. At the time of the PDC, Plaintiff was given another opportunity to address Grgic's allegations, tell his side of the story, or otherwise comment on the evidence Noce had collected. Only after these events was Schau's Disciplinary Action Report issued to Plaintiff advising him that he would be disciplined both for his inappropriate contact with Grgic and for being less than truthful during his interviews.[10]

Based on this collective evidence, the Court is satisfied that Plaintiff's pre-disciplinary process gave Plaintiff constitutionally adequate notice of his alleged misconduct, an explanation of PSP's evidence in support of that misconduct, and an opportunity to present his side of the story. *See Schmidt*, 639 F.3d at 596 (quoting *Loudermill,* 470 U.S. at 545). Consistent with the teachings of *Loudermill* and *Schmidt,* the pre-termination proceedings served as an adequate "check" against erroneous decision-making and allowed PSP to ensure there were reasonable grounds to believe that Plaintiff had touched Grgic inappropriately and was lying when he repeatedly denied it. *See id.* at 596-97 (quoting *Loudermill,* 470 U.S. at 545).

---

[10] In this regard, Plaintiff's argument is illogical. As a temporal matter, one could not be told before an interview that a possible basis for disciplinary action was actual untruthfulness during that very interview.

Plaintiff contends that a jury could find Schau's summary report to be constitutionally deficient because it failed to include a specific charge that Plaintiff had been untruthful during his interviews. The Court does not agree. For purposes of procedural due process, notice is meaningful and sufficient if it "apprises the individual of the substance of the matter at hand and permits adequate time to present any counter information and response." *Andrekovich v. Chenoga,* No. 2:11cv1364, 2012 WL 3231022, at *5 (W.D. Pa. Aug. 6, 2012) (citing *McDaniels v. Flick,* 59 F.3d 446, 454-57 (3d Cir. 1995)). As of the time that Plaintiff attended his pre-disciplinary conference, he was aware that Grgic's allegation of inappropriate contact turned on a credibility determination which pitted his own version of the facts against the statements of Grgic and Sibbald. After being twice advised by Noce that untruthfulness could result in adverse administrative action, Plaintiff had been repeatedly questioned concerning his account of the incident. He was aware that his own account of the incident was diametrically different from the accounts offered by Grgic and Sibbald, and he was given a chance to offer any explanation he might have for these differing accounts. Plaintiff therefore knew, as of the December 11, 2009 pre-disciplinary conference that his credibility was at issue and that he could be disciplined for untruthfulness.[11] He does not indicate any additional facts that he would have offered at the time of his PDC to rebut the charge of untruthfulness, had it been more specifically included in the Summary Report. *See Gniotek v. City of Phila.,* 808 F.2d 241, 244 (3d Cir. 1986) (notice was

---

[11] Plaintiff's awareness is further underscored by the fact that, in 2006, he was disciplined for taking money in exchange for an overtime shift and not being "forthcoming" about the incident during the IAD investigation. (See Defs.' Exs. M and N, ECF No. 83-5.) In his Notice of Disciplinary Penalty, Plaintiff was advised that "any future violations of Department rules and regulations of a similar nature will result in more severe discipline." (Defs.' Ex. N at ¶3, ECF No. 83-5.) After Plaintiff grieved the 2006 discipline, the arbitrator found that Plaintiff's "earlier failures to recollect his involvement in the buying and selling of overtime [during his IAD interviews] were not genuine." (Defs.' Ex. O, at p. 5, ECF No. 83-5.) Moreover, the arbitrator found that Plaintiff's untruthfulness constituted just cause for disciplinary action. (Id.) Thus, it is abundantly clear that Plaintiff was aware, at the time of his December 11, 2009 pre-disciplinary conference, that being untruthful in an IAD investigation constituted grounds for disciplinary action.

sufficient where it was of "such specificity to allow [plaintiff] the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges"). Consequently, the Court concludes, as a matter of law, that Plaintiff had constitutionally adequate pre-deprivation process relative to the charge of untruthfulness.

For similar reasons, the Court is not persuaded that a jury could find Schau's summary report constitutionally deficient simply because it omitted a specific charge of sexual harassment or sexual misconduct. As another district court has recognized, "Third Circuit precedent indicates that notice need only contain enough specificity to make the nature of the plaintiff's conduct clear, and in such an instance a failure to identify a specific broken 'rule' does not offend due process." *Leader v. Noonan,* No. 1:12-cv-2571, 2014 WL 3557117, at *6 (M.D. Pa. July 17, 2014) (citing *Schmidt,* 639 F.3d at 599-600) (granting summary judgment and concluding that, where notice "described in sufficient detail the alleged conduct," the Defendants' failure to "identify the specific rules that they claimed his conduct violated" did not deprive the plaintiff of due process)). *See also Copeland v. Phila. Police Dep't,* 840 F.2d 1139, 1145-46 (3d Cir. 1988) (affirming grant of summary judgment and holding that plaintiff's due process rights were not violated simply because the "city did not prepare the formal, written charges against [plaintiff] until after he had been dismissed"; "formal charge was based on the same information previously made available to [plaintiff], which he had the opportunity to refute"). As of the date of his pre-disciplinary conference, Plaintiff knew all of the facts that served as the basis both for Grgic's allegation of inappropriate contact and for PSP's subsequent charge of sexual harassment and sexual impropriety. Plaintiff was disciplined only after he was

given a chance to respond to this evidence and present his own side of the story. Accordingly, as a matter of law, Plaintiff's pre-deprivation process was constitutionally adequate.[12]

The Court also concludes, as a matter of law, that no due process violation occurred by virtue of the fact that Teter's November 9, 2010 Notice of Discipline omitted any specific reference to a "serious act of deception." Plaintiff argues that, because of this omission, he was not prepared to defend against the "serious act of deception" charge at the arbitration hearing and was therefore denied a meaningful opportunity to be heard, *see Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (noting that due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner"), but the evidence before the Court does not plausibly support Plaintiff's claim. The record from the arbitration hearing reflects that the arbitrator inquired about the proper framing of the issues at the start of the proceeding. PSP's lawyer indicated at the outset that she was proposing a two-part inquiry: the first issue would be whether Plaintiff committed a serious act of deception during the IAD investigation in violation of the CBA and, if not, the second (alternative) issue would be whether PSP otherwise had just cause to dismiss him. (*See* Arbitration Hr'g Tr. 8:22-9:8, January 6, 2011, ECF No. 83-2.) The Union's lawyer proposed a different framing of the issues: whether Plaintiff had violated department policy relative to both administrative and field regulations supporting just cause for discipline; and, if not, what the proper remedy should be. (Id. at 9:10-14.) The arbitrator indicated he would leave that matter open for further consideration pending completion of the testimony. (Id. at 9:15-20.)

---

[12] Of course, as noted above, both the PSP's Field Regulations and the relevant CBA specifically proscribed sexual harassment, sexual contact, and making of false statements by a Trooper. In his pre-deprivation "hearings" Gilson was told of the facts of the charges against him, and he is fairly charged with being cognizant of his obligations as to conduct under the Field Regulations and the CBA. Thus, he knew what the rules were, and the facts alleged that constituted violations of those rules. For a police officer to claim that he was deprived of notice when he knew of the "rules" applicable to his actions and the evidence against him is more than disingenuous. A review of the record as a whole, in a light most favorable to Plaintiff, supports only one conclusion – Trooper Gilson knew what was being alleged as wrongdoing.

Although each side proposed their own way of framing the relevant issues, the record does not reflect that the Union's lawyer ever objected to PSP's proposal on the grounds that it would unfairly disadvantage Plaintiff or the Union or otherwise result in a deprivation of due process. Simply put, neither Trooper Gilson or his lawyer claimed any sort of surprise or lack of notice. Had the Union's lawyer perceived a due process violation or some sort of unfair surprise, he could have sought a continuance of the hearing in order to adequately prepare a defense, but that did not occur. On the contrary, the record reflects that the Union pursued Plaintiff's defense consistent with the position Plaintiff had previously taken in his interviews – namely, that no inappropriate contact ever occurred and that the testimony of Grgic and Sibbald was simply not credible. In pursuing this line of defense, the Union offered Plaintiff's testimony and called three other witnesses on his behalf. It also entered exhibits and cross-examined PSP's witnesses. Following the arbitration hearing, the parties had the opportunity to submit further written argument on a number of points, including how the issues before the arbitrator should be framed, whether Plaintiff's conduct constituted a serious act of deception, and whether that phrase was ambiguous. (*See* Arbitration Hr'g Tr. at 198:5-199:24, ECF NO. 83-2; *see also* Pl.'s Ex. 42, ECF No. 99-3.)

When viewed collectively, the foregoing evidence belies Plaintiff's assertion that his arbitration proceeding failed to afford him a meaningful opportunity to be heard on the "serious act of deception" charge. Moreover, even if the arbitration proceeding could be viewed as constitutionally deficient, Plaintiff had access to judicial review under state law in the Commonwealth Court, which the record does not indicate he ever pursued. *See Pennsylvania State Police v. Pennsylvania State Troopers' Ass'n,* 656 A.2d 83, 89-90 (Pa. 1995) (holding that a court reviewing an arbitrator's award in an Act 111 grievance arbitration involves questions regarding: (1) the jurisdiction of the arbitrator, (2) the regularity of the proceedings, (3) an

excess of the arbitrator's powers, and (4) deprivation of constitutional rights). The Third Circuit has advised that, "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."[13] *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir. 2000) (citations omitted); *see Pedersen v. South Williamsport Area Sch. Dist.*, 677 F.2d 312, 315-17 (3d Cir. 1982) (grievance and arbitration hearing procedures under a collective bargaining agreement and state law fully satisfy due process requirements); *see Boysza v. Thompson*, No. 02:03CV1526, 2005 WL 2467617 at *4 (W.D. Pa. Oct. 5, 2005) (where rights of public employee are addressed under collective bargaining agreement with state court review, due process provided) (collecting cases). If, notwithstanding his apparent full participation in the arbitration, Plaintiff believed its conduct was irregular under state law, or was unconstitutional, the same state law which created his "due process" in this disciplinary setting also created more "due process" to redress it. Given that the question in this Court is whether the state gave him "due process," his apparent failure to fully use that process does not mean he was deprived of "due process." It simply means he elected to not use it. *See Dykes v.* SEPTA, 68 F.3d 1564, 1571 (3d Cir. 1995) (post-deprivation procedures under a collective bargaining agreement and state law fulfill post-deprivation due process). Based on the totality of these circumstances, even when viewed in a light most favorable to Plaintiff, a jury could not reasonably conclude that, by virtue of Teter's failure to include the

---

[13] In fact, it appears from some of Plaintiff's comments in his brief that the true purpose of Counts 1 and 13 is to relitigate the merits of Plaintiff's termination under the guise of a due process challenge. (See, e.g., Pl.'s Br. Opp. Mot. Summ. J. at 2 n.1, ECF No. 98 ("A fact-finder could draw the inference that [the contact between Plaintiff and Grgic] was insufficient to warrant discharge, and that, as a result, the PSP kept changing and adding to the charges against [Plaintiff] in violation of due process until it had enough purported wrongdoing to force a discharge.").) Such efforts are misplaced, as it is not the prerogative of this Court to conduct a merits-based review of PSP's disciplinary decision or the arbitrator's ruling upholding that decision. The merits review of such arbitration awards is provided for in Pennsylvania state law providing for their consideration on appeal to the Commonwealth Court. As noted, that was a "process" made available to the Plaintiff, and was part and parcel of any "due process" that he had at his disposal.

"serious act of deception" charge in his November 9, 2010 Notice of Disciplinary Penalty, Plaintiff was deprived of a meaningful opportunity to be heard concerning that charge. Consequently, Defendants' motion for summary judgment will be granted as to Counts 1 and 13.

### 2. Plaintiff's Procedural Due Process Claim Premised on the Alleged Deprivation of Future Employment Opportunities (Count 12)

In Count 12 of the FAC, Plaintiff asserts a claim against Defendants Schau, Christie, Teter, Facciolo, and Noonan premised on the theory that these Defendants deprived him of a protected liberty interest in future employment without due process of law. Plaintiff's theory is that Defendants stated and/or misled others into believing that he was terminated for having committed sexual harassment and sexual impropriety and that these charges were upheld in arbitration. (FAC ¶442.) In doing so, Plaintiff claims, the Defendants "imposed on [him] a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities and which might seriously damage his standing and associations in the community." (Id. ¶441.)

In his brief opposing summary judgment, Plaintiff clarifies that Count 12 is premised on Facciolo's act of publishing Christie's May 4, 2011 "Imposition of Arbitration Award." Plaintiff claims that, as a result of this publication, he has lost a number of promising jobs with employers who have indicated that they would not hire a former Commonwealth employee found guilty of sexual harassment and sexual misconduct.

Defendants argue that Plaintiff's claim fails as a matter of law for two reasons. First, Defendants maintain that the publication in question did not involve any statements that were untrue. Assuming, however, that Plaintiff suffered a constitutionally significant injury to his reputation, Defendants nevertheless maintain that Plaintiff received an adequate name-clearing hearing by virtue of his arbitration proceeding.

In order "to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (citations omitted); *see also McCarthy v. Darman*, 372 F. App'x 346, 351 (3d Cir. 2010). In the context of public employment, this "'stigma-plus' test has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." *Hill*, 455 F.3d at 236 (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)). "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'" *Hill*, 455 F.3d 236. When such a deprivation occurs, the employee is entitled to a name-clearing hearing. *Id.*

In this case, Defendants challenge only Plaintiff's ability to establish the "stigma" part of the "stigma-plus" test. To establish this criterion, a plaintiff must allege that the purportedly stigmatizing statements (1) were made publicly and (2) were false. *Hill,* 455 F.3d at 236 (citations omitted). Upon review of the record, this Court agrees with Defendants that Plaintiff has not satisfied the "stigma" criterion because the publication in question did not communicate information that was false.

As noted, Plaintiff claims that he was stigmatized when Facciolo sent Christie's May 4, 2011 "Imposition of Arbitration Award" memo to the Commonwealth's Department of Labor and Industry.[14] The relevant portions of Christie's memo state as follows:

1. A Disciplinary Action Report was issued to Trooper William L. Gilson on December 11, 2009 …. It was determined that the actions of Trooper Gilson in this matter was [sic] in violation of the following Field Regulations:

---

[14] Although Plaintiff contends that Christie's memo was sent to numerous state agencies, the evidence cited by Plaintiff in this regard shows only that Facciolo sent Christie's Imposition of Arbitration Award memorandum to the Department of Labor and Industry. (See PSAF ¶163 (citing Pl.'s Ex. 92, ECF No. 99-3).)

| SECTION | TITLE |
| --- | --- |
| F.R. 1-1.02, | Unbecoming Conduct |
| F.R. 1-1.28, | Internal Investigations |
| F.R. 1-1.35, | Discrimination or Harassment |
| F.R. 1-1.38, | Sexual Impropriety |
| F.R. 1-2.02, | Performance of Duty |
| F.R. 1-2.05, | Competency |
| F.R. 1-2.30, | Providing False Information |

*** 

3. On November 15, 210, Trooper Gilson was notified that … he was to be dismissed from the Pennsylvania State Police, and remain in a suspension without pay status pending the filing of a grievance, and if applicable, a subsequent decision by an arbitrator.

4. Trooper Gilson grieved the dismissal penalty and on January 6, 2011 an arbitration hearing was held. The arbitration award, dated May 2, 2011, denies Trooper Gilson's grievance. Therefore, the resolution of charges against Trooper Gilson has been concluded and the following action is taken: by the authority of the Commissioner of the Pennsylvania State Police, Trooper Gilson shall be dismissed from the Pennsylvania State police effective midnight, May 2, 2011.

(Pl.'s Ex. 42, ECF No. 99-3.)

Plaintiff maintains that Christie's memorandum was materially false and misleading because it asserted that Plaintiff had been terminated for committing sexual harassment and sexual impropriety and that those findings were upheld by an arbitrator. The memorandum does indeed state that Plaintiff's termination was premised, in part, on PSP's determination that Plaintiff had violated internal regulations proscribing "discrimination or harassment" and "sexual impropriety." However, there is nothing false about this statement. Plaintiff's Notice of Disciplinary Penalty expressly invoked these regulations as grounds for dismissal only after its Equal Employment Opportunity Office had rendered an opinion that the field regulations were, in fact, violated.

In addition, Christie's memorandum referenced the fact that Plaintiff grieved his termination and the grievance was denied. Once again, however, this was a true statement that did not necessarily imply that the arbitrator had specifically "upheld" the sexual harassment and/or sexual impropriety violations. To the extent Christie's memorandum was ambiguous about this point, however, any ambiguity was sufficiently resolved by the fact that Facciolo forwarded the actual arbitration decision to the Department of Labor & Industry, along with Christie's memo. Thus, that "publication" to the Department of Labor and Industry considered as a whole (as it must be, *see Forrest v. Owen J. Roberts Sch. Dist.*, Civil Action No. 09–3014, 2011 WL 1549492, at *17 (E.D. Pa. Apr. 1, 2011)(in determining whether a communication is capable of defamatory meaning, the allegedly defamatory statements must be viewed "in context") (citing *Baker v. Lafayette College,* 532 A.2d 399, 402 (Pa. 1987))), was both complete and accurate. Consequently, Plaintiff has failed to establish that his protected liberty interests were infringed by the publication of a false and stigmatizing statement.

At bottom, Plaintiff's due process theory is premised on several flawed assumptions that are not supported by the record. Plaintiff first argues that Turner-Childs should never have found him to be in violation of PSP's "discrimination or harassment" and "sexual impropriety" regulations in the first place because his alleged inappropriate contact with Grgic did not, in fact, meet the definitions of "sexual harassment" or "sexual misconduct" set forth in those regulations. Plaintiff next argues that PSP realized it could not defend these charges and therefore "abandoned" them at the arbitration hearing. Finally, Plaintiff reiterates that the arbitrator never actually ruled on his grievance that he was not in violation of the "Discrimination or Harassment" or "Sexual Impropriety" regulations. Collectively, Plaintiff states, this evidence demonstrates the materially false and misleading nature of PSP's statements that he was

dismissed for violating sexual harassment and sexual misconduct regulations and that those findings were upheld by the arbitrator.

This line of argument is unavailing. To begin with, Plaintiff's theory essentially asks this Court to engage in what is tantamount to an administrative review of Turner-Child's opinion for the purposes of determining whether she correctly applied PSP's own internal policies. Absent some evidence suggesting that Turner-Child's decision-making, in and of itself, involved a constitutional deprivation, this Court is not the proper forum for obtaining a substantive review of PSP's administrative decision-making. To the extent this type of review is appropriate, however, the Court finds insufficient evidence in this record from which a jury could reasonably conclude that Turner-Childs misapplied the regulations in question.[15]

---

[15] A review of the record suggests that Turner-Childs had reasonable grounds to believe that Plaintiff had violated Field Regulations 1-1.35 (incorrectly designated 1-1.25 in the Notice of Disciplinary Penalty, Pl.'s Ex. 35 at p. 8), pertaining to "Discrimination or Harassment" and Field Regulation 1-1.38, Pertaining to Sexual Impropriety. The former generally prohibits acts of sexual harassment. The latter regulation prohibits sexual impropriety, which would include acts of "sexual misconduct" and "sexual harassment."

Under the regulations, "sexual harassment" is defined to include "unwelcome sexual advances … or physical conduct of a sexual nature…, where any or all of the following occur: (1) Submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of an individual's employment. (2) Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individuals. (3) Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." (Pl.'s Ex. 77 at §1.38-(B).)

Plaintiff argues that he could not have engaged in "sexual harassment" within the meaning of the regulation because, by Turner-Childs' own admission, none of the circumstances set forth in subsections (1) through (3) applied in his case. However, Turner-Childs testified that subsections (1)-(3) apply to workplace sexual harassment involving supervisors and their subordinates. (Turner-Childs Dep. 91:4-93-5, ECF No. 99-14.) She found Plaintiff to be in violation of the regulation by virtue of having engaged in "unwelcomed sexual advances" and "physical conduct of a sexual nature" (id. at 93:6-16) vis-à-vis Grgic, and she noted in her June 8, 2010 memorandum that PSP's policy on harassment also prohibits "inappropriate behavior with any persons whom Department personnel may interact with as a result of work-related business or assignments." (Defs.' Ex. R, ECF No. 83-5; Pl.'s Ex. 74 at §26.03(K), ECF No. 99-3.) The evidence therefore establishes a reasonable basis for Turner-Childs' conclusion that Plaintiff had violated PSP's policy against "sexual harassment."

PSP's zero tolerance toward sexual impropriety includes not only act of sexual harassment, but also acts of "sexual misconduct." (Pl.'s Ex. 77,§1-1.38, ECF NO. 99-3.) Under the regulation, "sexual misconduct" is defined to include: "any uninvited or unwelcome sexual touching, sexual contact, or conduct of a sexual nature which victimizes another. Sexual touching or sexual contact includes intentional touching or other physical contact of a sexual nature, done either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person." (Id.)

Moreover, the record does not support Plaintiff's assertion that PSP abandoned the "sexual harassment" and "sexual misconduct" charges at arbitration because it realized it could not defend them.  In fact, PSP's counsel framed the relevant analysis as a two-part inquiry; while focusing chiefly on the "serious act of deception" issue, PSP argued in the alternative that it had just cause to terminate Plaintiff based on the violations charged in the Notice of Disciplinary Penalty.  (*See*  Arbitration Hr'g Tr. at 8:23-9:3, ECF No. 83-2.)  While Plaintiff makes much of the fact that PSP did not enter Turner-Child's memoranda into evidence, or offer any sexual misconduct/ sexual impropriety cases in support of those charges, the record reflects that PSP did offer other evidence concerning these charges.  In particular, Teter testified about each of the grounds for dismissal listed in his Notice of Disciplinary Penalty, including the charges relating to "discrimination or harassment" and "sexual impropriety."   (Arbitration Hr'g Tr. 114:18-115:16.)

Finally, the fact that the arbitrator did not specifically pass on the "harassment or discrimination"/ "sexual impropriety" issues in his decision does not support Plaintiff's theory that Facciolo's publication therefore involved a false and stigmatizing publication.  It is true that

---

Plaintiff asserts that Turner-Childs never found that Gilson's alleged touching of Grgic was "sexual" and, therefore, he could not have violated the policy.  According to Plaintiff, Grgic tried to hide this "fatal flaw" in her June 8, 2010 memorandum by omitting any reference to the word "sexual" when discussing the definition of "sexual misconduct," thereby falsely claiming that "any uninvited or unwelcome touching" would violate PSP's policy.

Plaintiff's assertion is unsupported by the record.  The Turner-Childs' June 8, 2010 memorandum reflects that she accurately defined "sexual misconduct" to include "any uninvited or unwelcome *sexual* touching*, sexual* contact, or conduct of a *sexual* nature which victimizes another…"  (Def.'s Ex. R at ¶4, ECF No. 83-5 (emphasis added).)  It is plain from her memorandum that she concluded Plaintiff had violated this standard by virtue of the fact that:

> Trooper Gilson while in uniform and on duty, grabbed Ms. Sandra GRGIC, crisis worker by the left hip/waist area and pulled her against him.  Ms. GRGIC immediately pulled herself away from Trooper GILSON.  Ms. GRGIC reported the physical contact she received was inappropriate, unwanted and on a personal area of her body.

(Id. at ¶4.)  Accordingly, the evidence establishes a reasonable basis for Turner-Childs' conclusion that Plaintiff had violated PSP's policy against "sexual misconduct."

Arbitrator Wolf premised his ruling solely on his conclusion that Plaintiff's conduct constituted a "serious act of deception." He therefore had no reason to rule one way or the other on the charges that Plaintiff had violated the "discrimination or harassment" and "sexual impropriety" regulations. However, this does not change the fact that PSP itself found Plaintiff to be in violation of those regulations and dismissed him partly on those grounds. Because all of this information was made known to the Department of Labor & Industry through Facciolo's publication of Christie's memorandum, accompanied by the arbitrator's decision, no false publication occurred.

For these reasons, the Court concludes that Plaintiff has not produced evidence sufficient to establish the "stigma" element of the "stigma-plus" test. Because Plaintiff has failed to demonstrate the deprivation of a protected liberty interest, his due process claim at Count 12 fails as a matter of law. *See McCarthy v. Darman,* 372 F. App'x 346, 351 (3d Cir. 2010) (where allegedly stigmatizing statements were not false, they did not show a "stigma," and consequently, plaintiff failed to show that he was deprived of a liberty interest without due process of law).[16]

---

[16] In addition, the Court notes that Facciolo's publication to the Department of Labor & Industry was apparently mandated by a Management Directive from the Governor's Office, which required Commonwealth agencies to provide the official personnel records of their employees to other Commonwealth agencies upon the latter's request. (*See* DSMF ¶¶ 48-50; Defs.' Ex. T, ECF No. 83-5.) Facciolo's communication was therefore absolutely privileged, even if Plaintiff could demonstrate that it contained stigmatizing content. *See Harrison v. Nationwide Mut. Fire Ins. Co.,* 580 F. Supp. 133, 136 (E.D. Pa. 1983) ("'[O]ne who is required by law to publish defamatory matter is absolutely privileged to publish it.'") (quoting the Restatement (Second) of Torts § 592A (1977)); *see also Zoe v. Impact Sys., Inc.,* No. 08-cv-1483, 2009 WL 275181, at *4-5 (M.D. Pa. Feb. 4, 2009) (defendants who operated a community home for mentally disabled individuals were immune from liability relative to a defamation claim arising from an oral report of abuse against a resident, as such reports were mandated by state law). Moreover, the privileged nature of Facciolo's publication is likely dispositive of Plaintiff's §1983 "stigma-plus" claim, to the extent that the "stigma" requirement is properly analyzed with reference to state law. *See, e.g., Casey v. Pallito,* No. 5: 12-CV-284, 2016 WL 96157, at *9 (D. Vt. Jan. 7, 2016) (statements of defendants that were made in court filings were privileged under state law and, therefore, could not form the basis of the plaintiff's "stigma plus" claim) (citing *Okemo Mountain, Inc. v. Sikorski,* No. 1:93-CV-22, 2006 WL 335858, at *3 (D. Vt. Feb. 14, 2006), for the proposition that, "under Vermont law, '[d]efamatory statements published by parties in the course of judicial proceedings [ ] ... are absolutely privileged, so long as they bear some relation to the proceedings'") (alterations and ellipsis in the original); *Sharpe v. City of New York,* No. 11 CIV. 5494 BMC, 2013 WL 2356063, at *6 n.10

### 3.    Plaintiff's "Void for Vagueness" Claim (Count 11)

In Count 11 of the FAC (asserted against Schau, Teter, and Christie), Plaintiff alleges that the CBA's reference to a "serious act of deception" is unconstitutionally vague.  Plaintiff claims the phrase is vague 'on its face" because it is not defined anywhere, there is no policy regarding what constitutes a "serious act of deception," and PSP provides no training as to what this phrase means.  Thus, Plaintiff argues, it is unclear whether a particular falsehood made during an investigation will be classified as a serious act of deception or as a non-serious one.  Plaintiff also argues that the "serious act of deception" standard is vague as applied to his case because he received no training on the standard and was never informed that his repeated denial of the same accusation constituted a serious act of deception necessitating termination regardless of mitigating circumstances.

"The 'void for vagueness' doctrine arises under the due process clause of the Fourteenth Amendment, and is designed to give 'fair warning' of prohibited conduct."  *Scavone v. Pennsylvania State Police,* 501 F. App'x 179, 181 (3d Cir. 2012) (citing *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992)).  "In the public employment context, 'the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge.'" *Id*. (quoting *San Filippo,* 961 F.2d at 1136).  "Standards for public employees 'are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge.'" *Id*. (quoting *San Filippo*, 961 F.2d at 1136). This inquiry must be undertaken on a "case-by-case basis," and "the party opposing the statute or standard must show that it is vague as applied to him."  *Borden v. School Dist. of Tp. of East Brunswick*, 523 F.3d 153, 167 (3d Cir. 2008) (*citing San Filippo*, 961 F.2d at 1136).  "In

(E.D.N.Y. May 29, 2013) (noting that "federal courts in New York often look to New York defamation law when analyzing a 'stigma-plus' claim") (citing authority), *aff'd*, 560 F. App'x 78 (2d Cir. 2014).

completing this analysis, it is important to note that, in the civil context, statutes need not be as precise as in the criminal context and are, therefore, less likely to be invalidated under a void-for-vagueness challenge." *Id*. (citing *San Filippo*, 961 F.2d at 1135).

In this case, Plaintiff's termination was upheld on the ground that he had committed a "serious act of deception," which is one of the so-called twelve "deadly sins" set forth in Appendix E of the parties' collective bargaining agreement.[17]  The relevant language states that:

> [c]ertain conduct immediately and absolutely threatens the integrity of the Department's public duty and responsibility.  In the following circumstances, the proper level of discipline is termination of employment, notwithstanding any mitigating circumstances.  Such conduct includes, but is not limited to… [t]he commission of a serious act of deception during a criminal, civil or administrative investigation or proceeding, when under a specific, official obligation to be truthful, involving intentional (1) lying; (2) fabrication; (3) misleading acts or words; (4) civil or criminal fraud; or (5) perjury.

(Pl.'s Ex. 104, ECF No. 99-3.)

As applied to Plaintiff's conduct in this case, this language[18] cannot reasonably be viewed as unconstitutionally vague.  It is undisputed that Plaintiff's alleged acts of deception occurred in the context of an internal administrative investigation – at a time, in other words, when Plaintiff was under an express obligation to respond truthfully.  The investigation concerned Plaintiff's alleged act of touching a crisis worker inappropriately while in uniform and on duty – serious misconduct in and of itself.  Plaintiff was interviewed at length on two occasions and questioned repeatedly about the nature of his contact with Grgic.  Because Plaintiff was one of the three

---

[17] The arbitrator cited "Appendix E-5," which appears to relate to the Collective Bargaining Agreement in effect from July 1, 2004 to June 30, 2008, as set forth in the record at Plaintiff's Exhibit 104 (ECF No. 99-3).  However, the same identical language also appears at Appendix F-5 to the CBA that was in effect from July 1, 2008 to June 30, 2012, as set forth in the record at Plaintiff's Exhibit 103 (ECF No. 99-3).  To the extent this discrepancy is relevant, it is immaterial for present purposes, as the provisions in the two CBAs relating to a "serious act of deception" are identical.

[18] In essence, in this regard the Plaintiff asks this Court to conclude that the labor agreement bargained for by his own Union was unconstitutional.  He offers no case law authority for that principle.  *See Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d. Cir. 1983) (labor union is exclusive representative of members).

main witnesses to the incident, his statements were material to the investigation. Prior to his two interviews, Plaintiff was expressly advised that he was required to answer questions truthfully and completely or he would face administrative action. Notwithstanding these warnings, Plaintiff repeatedly and adamantly denied Grgic's allegations, even to the point of asserting that Grgic could not have been telling the truth. As the arbitrator noted, "it could not be plainer that [the differing accounts given by Plaintiff and Grgic] are sharply at odds and totally irreconcilable; if one is true, the other must be false." (Pl.'s Ex. 41 at p. 8, ECF No. 99-3.) Like the PSP, the arbitrator found Grgic's account credible and Plaintiff's account not credible, even when judged by the "clear and convincing" standard of proof imposed on the PSP. (*Id.*) Based on the diametrically differing accounts offered by Plaintiff, on one hand, and Grgic/Sibbald on the other, the PSP reasonably concluded that Plaintiff was lying about the incident. The arbitrator described Plaintiff's behavior in similar fashion: "a conscious choice to fabricate testimony well over a dozen times during the course of an IAD investigation." (Pl.'s Ex. 41, at p. 12.)

Considering the foregoing circumstances, the Court finds that "ordinary persons using ordinary common sense" would know that repeatedly and falsely denying misconduct during the course of an administrative investigation arises to a "serious act of deception," thus putting them at risk of discharge. *See Scavone,* 501 F. App'x at 181; *San Filippo,* 961 F.2d at 1136. The Court's conclusion in this regard is not altered by the fact that the phrase "serious act of deception" is not more elaborately defined in the CBA or by a policy statement or through specific training.[19] *See San Filippo,* 961 F.2d at 1136 ("Simply because a criminal statute could

---

[19] Plaintiff does not advise the Court as to what kind of training would have been needed to teach a Pennsylvania State Trooper that he was obliged to tell the truth during an official investigation or in sworn testimony at a formal hearing.

have been written more precisely does not mean the statute as written is unconstitutionally vague.")  Nor is the Court's conclusion altered by the fact that numerous PSP officials deposed in this case acknowledged they could not define the term in the abstract.  The relevant inquiry for present purposes is not whether the phrase is vague when considered in the abstract, but rather, whether it is vague as applied to Plaintiff's situation.  *See United States v. Mazurie,* 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.") (internal citation omitted); *Borden,* 523 F.3d at 167 (vagueness inquiry must be undertaken on a case-by-case basis) (citation omitted); *Graham v. DA of Bucks Cty.*, Civil Action Nos. 10–1130, 10–1131, 10–1132, 2015 WL 1229492, at *18 (E.D. Pa. Aug. 18, 2014) ("The inquiry is undertaken on a case-by-case basis, and a reviewing court must determine whether the statute is vague as applied to the affected party.")(citations omitted), *report and recommendation adopted* (Mar. 17, 2015), *certificate of appealability denied* (3d Cir. Aug. 06, 2015) (Case Nos. 15-1893 to 15-1895).

As noted, conduct standards challenged in a civil context need not be as precise as in the criminal context; they are, therefore, "less likely to be invalidated under a void-for-vagueness challenge."  *Borden,* 523 F.3d at 167.  Even in the criminal context, however, a vagueness challenge can be defeated where reasonable persons would know that their conduct puts them at risk of criminal prosecution.  *See San Filippo,* 961 F.2d at 1136 (citing *Maynard v. Cartwright,* 486 U.S. 356 (1988)); *Graham,* 2015 WL 1229492, at *18.  "Additionally, the inclusion of a scienter requirement alleviates vagueness concerns because a *mens rea* element makes it less likely that a defendant will be convicted for an action that he or she committed by mistake."  *Graham,* 2015 WL 1229492, at *18 (citing authority).  Here, for the reasons discussed, the Court concludes as a matter of law that reasonable persons in Plaintiff's situation would know that the

act of repeatedly and falsely denying misconduct in the course of an administrative investigation would put them at risk of discharge under the CBA's "serious act of deception" provision. The requirement that there be "deception" implicitly incorporates a *mens rea* component that makes it less likely an employee will be discharged for inaccurate information that is imparted mistakenly, rather than intentionally.

Accordingly, the Court concludes that the CBA's proscription against "serious acts of deception" is not unconstitutionally vague. Defendants' motion will therefore be granted as to Count 12 of the FAC.

### 4. *Plaintiff's Equal Protection Claim (Count 2)*

In Count 2 of the FAC, Plaintiff asserts a claim against Schau, Teter, Christie, and Sibbald for the alleged violation of his equal protection rights.[20] Plaintiff alleges that Schau, Teter and/or Christie intentionally treated him less favorably than similarly-situated PSP officers who had also engaged in comparable or worse misconduct. (FAC ¶213.) He alleges that Sibbald "also mistreated [him] because of his gender through his false accusations of misconduct … as well as his gender stereotyping claims that Plaintiff was a 'freak' and a 'pervert.'" (*Id.* at ¶ 214.)

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, §1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman ex rel. Shertzer v. Penn Manor School Dist.,* 422 F.3d 141, 151 (3d Cir. 2005) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "In order to bring a successful section 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." *Id.* (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990)). "In

---

[20] Plaintiff has sued each of these Defendants in their individual capacities for money damages based on their respective roles in Plaintiff's termination. (*See* FAC ¶¶ 201-02.) He also sues Schau in his official capacity for prospective injunctive relief, "including reinstatement." (*Id.* ¶200.)

other words, they must demonstrate that they received different treatment from that received by other individuals *similarly situated*." Id. (emphasis in the original) (citing *Andrews,* 895 F.2d at 1478). "Specifically, to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon his gender." *Id*. (citing *Andrews,* 895 F.2d at 1478). "Persons are 'similarly situated' for purposes of an equal protection claim when 'they are alike in *all* relevant aspects.'" *Castaneira v. Potteiger,* 621 F. App'x 116, 121 (3d Cir. 2015) (quoting *Startzell v. City of Phila.,* 533 F.3d 183, 203 (3d Cir. 2008)) (emphasis in the original).

As an initial point, the Court notes that there is no evidence in the record to support the conclusion that Sibbald or Schau treated Plaintiff less favorably than "similarly situated" female officers or otherwise acted with an unlawful gender-based discriminatory intent. At this point in the proceedings, Plaintiff may not rely on mere allegations of wrongdoing. *See Quiroga v. Hasbro, Inc*., 934 F.2d 497, 500 (3d Cir. 1991) (the party opposing summary judgment must present more than just "mere allegations, general denials, or ... vague statements" to show the existence of a genuine issue of material fact). Consequently, the Defendants' motion for summary judgment as to Count 2 will be granted as to Sibbald and Schau.

Plaintiff's claims against Teter and Christie require a bit more discussion but, ultimately, the Court concludes that these claims are legally unsupportable as well. In support of his claim in Count 2, Plaintiff points to two pieces of evidence which, he believes, show that he was subjected to unlawful, gender-based discrimination. The first involves a situation in which a male PSP Officer performed a "bear hug" on another male Officer, picking him off the ground and inadvertently injuring him. There was never any internal investigation by PSP into whether this incident constituted "sexual harassment" or "sexual impropriety," and the offending Officer was ultimately transferred to a different Troop rather than being terminated. What this shows, according to Plaintiff, is that PSP applied a gender-based stereotype in his case by assuming that

a male officer's contact with a female is necessarily "sexual," just because the male displays a "machismo"[21] attitude. *See City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 708 (1978) (stating that, under federal anti-discrimination laws, "...employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females"). Plaintiff contrasts his own situation with the "bear hug" incident where, he claims, the offending Officer arguably displayed a "machismo" attitude toward another male but was never accused of any sexual impropriety.

The Court concludes that this evidence has no probative value insofar as it relates to Teter or Christie. To begin with, Plaintiff has offered no evidence that Teter was personally involved in the "bear hug" incident. Similarly, while Christie testified about this incident, Plaintiff has not pointed to any evidence establishing that she was personally involved in the disciplinary penalty imposed as opposed to having some institutional knowledge about it. Even if she was involved, the Court is not persuaded that the "bear hug" incident can rationally support a plausible inference that Christie acted with purposeful, gender-based animus against Plaintiff in this case or that her ratification of Plaintiff's penalty was driven by an inappropriate gender-based stereotype. This is particularly true in light of the fact that Plaintiff's charges of sexual harassment and sexual impropriety were imposed only after PSP's Equal Employment Opportunity Office specifically considered the matter and opined that Plaintiff's conduct did, in fact, violate the sexual harassment and sexual impropriety regulations.

---

[21] During the course of the IAD investigation, Grgic had described Plaintiff as displaying a "machismo attitude," (PSAF ¶37), although she never alleged that she had been touched in a sexual area or sexually harassed. (See PSAF ¶90.)

Plaintiff's second piece of evidence concerns the case of Trooper Carrie Gula[22] who, like Plaintiff, was found to have lied[23] and was discharged by PSP. After Gula grieved her dismissal, the arbitrator determined that PSP had not demonstrated just cause for her dismissal by clear and convincing evidence, so he ordered her reinstated. The significant fact, from Plaintiff's point of view, is that Gula, unlike himself, had been informed in her Notice of Disciplinary Penalty that PSP was charging her with violating one of the twelve (12) "deadly sins" set forth in the CBA. (*See* Pl.'s Ex. 105 at p. 5 (suggesting that Gula's Notice of Disciplinary Penalty recited that she had violated "Appendix F of the Collective Bargaining Agreement").)

This incident, like the "bear hug" incident, is insufficient to support a rational inference of purposeful, gender-based discrimination on the part of the named Defendants. First, there is no evidence before the Court to suggest that Teter was personally involved in Gula's case, nor is it clear from the record what specific role (if any) Christie played in that matter. Without a record basis for inferring the personal involvement of these Defendants in both employment decisions, a factfinder cannot reasonably interpret this evidence as somehow shedding light on the Defendants' intent in their actions toward Plaintiff. More fundamentally, however, the anecdotal evidence about Trooper Gula's case actually *undermines* Plaintiff's equal protection claim because it demonstrates that the relevant PSP officials took action to dismiss a female Trooper who, like Plaintiff, was found to have lied. Thus, the incident demonstrates that PSP

---

[22] In their briefs, the parties refer to Trooper Gula as "Ann Gula." The reason for the discrepancy is not clear, but the Court will refer to her as "Carrie Gula," consistent with the references to her in the arbitrator's decision. (*See* Pl.'s Ex. 105, ECF No. 99-3.)

[23] According to the arbitrator's decision, Trooper Gula was charged with "commit[ing] false reports to law enforcement authorities, unsworn falsification and harassment… lying in a criminal and an administrative investigation." (Pl.'s Ex. 105, ECF No. 99-3 at p. 2 (internal quotation marks and citation omitted) (alteration and ellipsis in the original).)

officials actually treated similarly situated male and female Troopers in like fashion.[24]  Although Plaintiff draws significance from the fact that Gula, unlike himself, received formal pre-arbitration notice that she was being accused of committing a "deadly sin," the Court concludes that this distinction does not plausibly support a rational inference that either Teter or Christie *purposefully* tried to place Plaintiff at a procedural disadvantage, by drafting an under-inclusive Notice of Disciplinary Penalty, *on account of his gender*.  Finally, and most obviously, it was the arbitrator, not the PSP, Teter or Christie, who reinstated Gula.

Because Plaintiff has failed to adduce evidence supporting an inference that Schau, Sibbald, Teter, or Christie personally acted with a purposeful, gender-based animus toward him, his equal protection claim against those Defendants cannot survive summary judgment. Accordingly, Defendants' motion will be granted with respect to Count 2 of the FAC.

### B.    Plaintiff's Claims for Alleged Sex Discrimination in Employment (Counts 7 and 9)

In Counts 7 and 9 of the FAC, Plaintiff asserts claims against PSP for alleged gender-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e–2(a)(1), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §955(a), respectively.

---

[24] Defendants cite other instances in which PSP sought to dismiss female Troopers for acts of dishonesty. (See Defs.' Br. Supp. Mot. Summ. J. at 7-8 (ECF No. 81); DSMF ¶¶ 12-14.)  Although Plaintiff takes issue with certain aspects of Defendants' proffer, it is undisputed that PSP dismissed one female Trooper ("Trooper A.Y.") based on its determination that she had lied to investigators during the course of an investigation concerning an alleged scheme to cheat on a promotion test. (DSMF ¶12.)  Trooper A.Y. was later reinstated after the arbitrator ruled that she had not been untruthful. (*See* Christie Dep. 363:24-364:5, ECF No. 83-3.)  It is also undisputed that Teter recommended the dismissal of a second female Trooper ("Trooper A.W.") who had been investigated for recording inaccurate radar information on traffic citations. (*See* DSMF ¶14; Teeter Dep. at 55:24-57:23.)  Teeter recommended dismissal after determining that Trooper A.W. had been untruthful during PSP's investigation of the incident, but Trooper A.W. retired from service in lieu of being fired. (*Id.* at 57:24-58:3.)  Although neither Trooper A.Y. nor Trooper A.W. was ultimately discharged from her job, PSP clearly sought a dismissal in both cases.  This fact under-cuts Plaintiff's theory that he was treated differently by PSP's decision-makers because of his gender.

Claims under Title VII and the PHRA are analyzed under the familiar burden-shifting paradigm outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973).[25]  To establish a showing of a prima facie case of gender discrimination under Title VII, a plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably or the adverse employment decision occurred under circumstances that could give rise to an inference of intentional discrimination.  *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013) (citations and internal quotation marks omitted).  "If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, she has not met her initial burden, and summary judgment is properly granted for the defendant."  *Id.* (citing *Geraci v. Moody–Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)).

If the plaintiff establishes a prima facie case, the employer then has the burden of articulating a legitimate non-discriminatory justification for the adverse employment action. *Burton,* 707 F.3d at 426 (citations and internal quotations omitted).  Once the employer does so, the burden of production shifts back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination.  *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764–65 (3d Cir. 1994) and *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799–800 (3d Cir. 2003)).

To make a showing of pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Burton,* 707 F.3d

<hr>

[25] The Third Circuit has instructed that claims brought under the PHRA should be "construed consistently with interpretations of Title VII."  *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1084 (3d Cir. 1995).

at 427 (citing *Fuentes*, 32 F.3d at 764). "The plaintiff's evidence, if it relates to the credibility of the employer's proffered justification, 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Fuentes*, 32 F.3d at 765). If the Plaintiff does so, the jury may then "infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Id.*(citing *Fuentes*, 32 F.3d at 764, and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

Defendants have moved for summary judgment on Plaintiff's Title VII and PHRA claims on the grounds that Plaintiff has failed to adduce evidence sufficient to prove either his prima facie case or that the stated reason for his discharge was pretextual. The Court finds these arguments persuasive.[26]

In support of his Title VII and PHRA claims, Plaintiff relies on the same evidence proffered in support of his equal protection claim – namely, the "bear hug" incident involving contact between two male PSP Officers, and the termination proceedings of Trooper Gula. For the reasons discussed in connection with Count 2, when these incidents are viewed in the context of the entire record, they are insufficient to support a reasonable inference that Plaintiff's termination was motivated by his gender. There is simply no record evidence supporting an inference that similarly-situated others were treated more favorably based on their gender. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008), *order clarified*, 543 F.3d 178

---

[26] The Court therefore finds it unnecessary to resolve Defendants' alternative arguments that Plaintiff's Title VII claim is untimely and that Plaintiff failed to properly exhaust his administrative remedies for purposes of his PHRA claim.

(3d Cir. 2008) (noting that, for purposes of demonstrating the fourth element of a prima facie employment discrimination case, "[t]he evidence most often used to establish this nexus [between the plaintiff's protected status and the adverse employment action] is that of disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class") (citing cases); *see also McClung v. Songer Steel Servs., Inc.*, 1 F. Supp. 3d 443, 451 (W.D. Pa. 2014) (noting that the fourth prima facie element of a Title VII claim requires the plaintiff to show that similarly situated persons outside of the plaintiff's protected class were treated more favorably or that other circumstances in the case give rise to an inference of unlawful discrimination) (citing authority). Because Plaintiff has not established a prima facie case of gender discrimination under Title VII or the PHRA, his claims at Counts 7 and 9 are subject to summary judgment on that basis alone.

In addition, however, Plaintiff has not pointed to evidence that could support a reasonable inference of pretext. There is no dispute that PSP has met its burden of articulating a nondiscriminatory reason for Plaintiff's discharge – namely, Plaintiff's untruthfulness during the IAD investigation. Plaintiff has not shown that PSP's explanation suffers from internal "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that make it dubious. *Burton,* 707 F.3d at 427. On the contrary, the plausibility of PSP's explanation is substantiated by the fact that a neutral arbitrator found Plaintiff's untruthfulness to be "just cause" for his termination.[27] Plaintiff's only proffer relative to pretext is his attempt to show

---

[27] Although Defendants argue that the arbitrator's award "estops" Plaintiff from challenging his discharge on gender discrimination grounds (*see* Defs.' Br. Supp. Mot. Summ. J. at 16), the Court recognizes that no preclusive effect should be given to the arbitrator's decision relative to Plaintiff's Title VII or PHRA claims. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 706 n.5 (3d Cir. 1989) (noting that arbitrator's decision was not entitled to preclusive effect in federal court). *See also Coleman v. Donahoe,* 667 F.3d 835, 854 (7th Cir. 2012) (where collective bargaining agreement did not require submission of Title VII claims to labor arbitration, any decision by the arbitrator on Title VII issues such as pretext would have no preclusive effect in federal court) (discussing *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56, 59-60 (1974) and *14 Penn Plaza v. Pyett,* 556 U.S. 247, 248 (2009)). Pursuant to *Gardner-Denver*, this

inconsistency on the part of PSP by pointing to the fact that neither the November 15, 2010 Notice of Disciplinary Penalty nor the May 5, 2011 Imposition of Arbitration Award specifically referenced Plaintiff's commission of a "serious act of deception." However, this alleged inconsistency does not support a reasonable inference of pretext when viewed against the fact that: (i) at each phase of its disciplinary process – from Schau's DAR, to Teeter's Notice of Disciplinary Penalty, to the arbitration proceeding -- PSP's adverse employment decisions were premised in material part on Plaintiff's lack of truthfulness during his interviews with Noce; and (ii) PSP disciplined female Troopers in similar fashion for untruthfulness. Because Plaintiff has failed to identify evidence from which a factfinder could reasonably either (1) disbelieve PSP's explanation for Plaintiff's discharge or (2) conclude that PSP's decision was more likely than not motivated by gender discrimination, Plaintiff's Title VII and PHRA claims fail as a matter of law. Accordingly, Defendants' motion will be granted as to Counts 7 and 9 of the FAC.[28]

---

Court must consider Plaintiff's Title VII claims *de novo*, but "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate," 415 U.S. 60, taking into account factors such as: "[1] the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, [2] the degree of procedural fairness in the arbitral forum, [3] adequacy of the record with respect to the issue of discrimination, and [4] the special competence of particular arbitrators." *Id*. at n. 21. *See also Anderson v. United Parcel Serv., Inc.*, No. 3:13-CV-135, 2015 WL 1245843, at *18 (W.D. Pa. Mar. 18, 2015). Here, the first factor is inconclusive, as the record does not include the entirety of the relevant CBA. The third factor weighs against giving the arbitrator's decision substantial weight as to these claims, because there is no indication that gender discrimination issues were addressed at the arbitration proceeding. The second and fourth factors weigh in favor of according the arbitrator's decision some weight, since Mr. Wolf is an experienced and competent arbitrator and, notwithstanding Plaintiff's arguments to the contrary, the arbitration procedures satisfied the demands of due process. Based on these considerations, the Court will not accord Mr. Wolf's decision substantial weight. Instead, the Court will simply note that his ruling generally supports the plausibility of PSP's explanation for discharging Plaintiff, and the PSP's abiding by his award certainly provides a legitimate non-discriminatory reason for the actions taken. There is no plausible evidence advanced that the PSP's acting in conformity with that award was in any fashion pretextual, e.g. that is "unworthy of credence."

[28] Defendants also argue that Plaintiff's Title VII claims are barred by the statute of limitations, since they were filed more than 90 days after Plaintiff received his right-to-sue letter from the EEOC. See 42 U.S.C. §2000e-5(f)(1) ("If a charge filed with the Commission...is dismissed by the Commission,...the Commission...shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge."); *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 349-40 (3d Cir. 1999) (noting that

## C.    **Plaintiff's Claims Based on an Alleged Hostile Work Environment (Counts 8 and 10)**

In Counts 8 and 10, Plaintiff asserts claims against PSP for allegedly subjecting him to a hostile work environment in violation of Title VII and the PHRA, respectively.  As in Counts 7 and 9, Plaintiff claims the hostile work environment was the result of gender-based discrimination.  Defendants contend that Plaintiff has failed to produce evidence sufficient to establish a hostile work environment.  They further argue that the Title VII claim is untimely and that Plaintiff failed to properly exhaust his administrative remedies for purposes of his PHRA claim.  The Court need only address Defendants' first argument, as it provides sufficient grounds for granting summary judgment.

To prevail on a hostile work environment claim under Title VII, a plaintiff must establish that:  (1) he suffered intentional discrimination based on a protected ground (here, gender) (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) *respondeat superior* liability exists.  *Bright v. LabCorp.,* 627 F. App'x 75, 77  (3d Cir. 2015) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).  Federal courts

---

Title VII's ninety-day time limit for filing claims is akin to a statute of limitations). There is no dispute in this case that Plaintiff received his "right to sue" letter on April 30, 2012 (DSMF ¶51), but he did not assert his Title VII claims until the filing of his Second Amended Complaint on November 16, 2012. (See ECF No. 33)  Plaintiff contends that the right-to-sue letter was misplaced by his attorney's office staff and, as a result, his attorney was not aware of the letter until it was located within the office on or about October 22, 2012.  (See Decl. of Thomas M. Huber, Esq. at ¶¶ 4-8, ECF No. 99-15.) Based on these facts, the Court finds no basis for applying traditional notions of equitable tolling.   See *Carter v. Keystone*, 360 F. App'x 271, 272-73 (3d Cir. 2010) ("Equitable tolling is generally appropriate in Title VII cases only when 'the defendant has actively misled the plaintiff; when the plaintiff in some extraordinary way was prevented from asserting her rights; or when the plaintiff timely asserted her rights in the wrong forum.'")  (quoting *Seitzinger*, 165 F.3d at 240).  Plaintiff may have a better argument that, pursuant to Rule 15(c), his Title VII claims in the Second Amended Complaint relate-back to his other claims in the First Amended Complaint (ECF No. 16).  *See* Fed. R. Civ. P. 15(c)(1)(B). However, given the Court's merits-based disposition of the Title VII claims as set forth herein, the Court need not resolve whether application of the relation-back doctrine in this case would offend Congress's intent, embodied in the 90-day Title VII filing period, that such claims be asserted promptly.

apply a "totality of the circumstances" approach to determine whether the threshold level of severity and pervasiveness has been reached, considering factors such as "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).[29]

In support of his claims at Counts 8 and 10, Plaintiff argues that he was "falsely accused of sexually harassing Grgic which created the hostile work environment and labeled him a sexual harasser." (Pl.'s Mem. Law Opp. Defs.' Mot. Summ. J. at 22, ECF No. 98.) He cites numerous cases in his brief for the general proposition that "[a]ccusations predicated on stereotypical behavior can constitute evidence of a sexually hostile work environment." (*Id.* at 21 (citing cases).) However, the cases cited by Plaintiff are distinguishable from the instant case in that they all involved evidence of harassing conduct that was substantially more pervasive, severe, and offensive than anything alleged here. *See, e.g., Spain v. Gallegos*, 26 F.3d 439, 447-49 (3d Cir. 1994) (plaintiff's superior allegedly fostered rumors of a sexual relationship with her that resulted in poor relations between plaintiff and her co-workers over a period of several years, negative evaluations for advancement purposes, and the denial of a promotion); *Brown-Baumbach v. B&B Automotive, Inc.*, 437 F. App'x 129, 131-32 (3d Cir. 2011) (plaintiff offered evidence of numerous sexual jokes, sexual comments, or remarks with a sexual connotation made to her or about her frequently over a four-month period, including rumors that she was having an affair with a co-worker); *Hare v. H&R Indus., Inc.,* 67 F. App'x 114 (3d Cir. 2003)

---

[29] For purposes of Plaintiff's hostile work environment claims, as with his other gender discrimination claims, the standard for employer liability under the PHRA is the same standard applied for purposes of Title VII. *See Clegg v. Falcon Plastics, Inc.,* 174 F. App'x 18, 24 n.6 (3d Cir. 2006) (noting, for purposes of a hostile work environment claim, that the court's Title VII analysis would apply equally to the plaintiff's PHRA claim).

(upholding district court's verdict for plaintiff on hostile work environment claim where district court found that "workplace was permeated with discrimination, ridicule, and insult," of a sexual nature; hostile acts included co-workers putting their arms around plaintiff, pinching her buttocks, approaching her with open hands as if to touch her breasts, circulating a drawing of a naked woman that was supposed to be the plaintiff, and circulating rumors that plaintiff was having an affair with more than one co-worker).

In this case, by contrast, Plaintiff has failed to offer evidence that could satisfy the first four elements of his hostile environment claim. In his brief in opposition to the pending motion, Plaintiff fails to point to any specific evidence of record that would shed light on the nature or severity of the alleged hostile conduct, the frequency with which it occurred, and/or whether it unreasonably inhibited Plaintiff's work performance. At his deposition, Plaintiff stated that he was basing his claim on PSP's allegedly biased investigation and arbitration as well as its post-termination conduct in allegedly interfering with Plaintiff's efforts to obtain employment at another state agency. (*See* DSMF ¶ 19.)

It is undisputed that Noce interviewed Plaintiff twice in connection with the IAD's investigation -- once in October 2009 and once in November 2009, and the arbitration proceeding itself took only one day. (Id. ¶¶ 20-21.) There is nothing beyond this in the record to suggest that Plaintiff endured acts of hostility on a frequent or severe basis from fellow Troopers or supervisors as a result of the charges against him.[30] Although Plaintiff may have suffered embarrassment from the IAD investigation and his ensuing termination, a review of the transcripts from Plaintiff's investigatory interviews and arbitration proceedings fails to evidence

---

[30] To be perfectly clear, the Court does not conclude that Plaintiff's being interviewed based on complaints to the PSP, and then going to arbitration, are PSP-directed "hostility." They are part and parcel of the very "due process" that Plaintiff claims he was deprived of.

any threatening or humiliating conduct perpetrated against Plaintiff by the relevant PSP agents. In addition, there is no evidence of hostile conduct that unreasonably interfered with Plaintiff's work performance. On the contrary, Plaintiff admits in the FAC that, during the time that allegations of his misconduct were pending, his work conditions did not change at all. (Id. ¶24.) In fact, during this time, he was involved in numerous criminal investigations and arrests and received positive evaluation reports. (Id. ¶23.) As for Plaintiff's allegation that PSP engaged in post-termination harassment by interfering with his efforts to obtain employment, Defendants correctly observe that such conduct, even if true, could not constitute evidence of a hostile work environment, since Plaintiff had already left PSP's employment at the time of this alleged harassment.

Based on the foregoing, the Court concludes that Plaintiff has failed to adduce evidence that would be sufficient to support the existence of a hostile work environment for purposes of Plaintiff's claims at Counts 8 and 10 of the FAC. Accordingly, Defendants' motion for summary judgment will be granted as to those claims.

### D.    Plaintiff's Claim Based on an Alleged Violation of COBRA (Count 4)

In Count 4 of the FAC, Plaintiff alleges that PSP violated his rights under the Public Health Services Act ("PHSA"), 42 U.S.C. §§300bb-1 *et seq.,* as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). "The PHSA provides that state-operated group health plans must offer 18 months of continuing coverage to qualified beneficiaries who otherwise would lose coverage as a result of a 'qualifying event.'" *Larsen v. Senate of the Commonwealth of PA,* 154 F.3d 82, 95 (3d Cir. 1998) (citing 42 U.S.C. §§300bb-1(a), 300bb-2(2)). Under the PHSA, the term "qualifying event" includes "termination (other than by reason of [the] employee's gross misconduct)." *Id.* (citing 42 U.S.C. §300bb-3(2)

(alternation in the original). Thus, a termination based on the employee's "gross misconduct" is not a qualifying event that triggers continuing health care coverage.

In their motion for summary judgment, Defendants contend that the circumstances giving rise to Plaintiff's termination constituted "gross misconduct," and PSP was thereby relieved of any obligation to provide him with continuing coverage. *See* 42 U.S.C.A. §300bb-3(2). Plaintiff denies that the "gross misconduct" exception applies here.

"Neither the PHSA, nor the comparable statute applicable to private employers [*i.e.,*"COBRA," 29 U.S.C. §1161(a)], defines the term 'gross misconduct.'" *Larsen,* 154 F.3d at 96 (citing 42 U.S.C. §§300bb-1 *et seq.*; 29 U.S.C. §§1161 *et seq.*). However, in *Chatterjee v. School Dist. of Philadelphia*, 170 F. Supp. 2d 509 (E.D. Pa. 2001), the district court noted that, for purposes of COBRA:

> [o]ther courts have applied the standards set forth in state unemployment compensation situations. *See, e.g., Rotto v. Haskells of Pittsburgh, Inc*., 1997 WL 689437 * 5 (W.D. Pa. 1997) ("gross misconduct" under COBRA defined with reference to Pennsylvania unemployment compensation cases); *Adkins v. United Int'l. Investigative Services, Inc*., 1993 WL 345186 (N.D. Cal. 1993) (referencing California's unemployment compensation laws); *cf. Lloyd v. Hanover Foods Corp*., 72 F. Supp. 2d 469 (D.Del. 1999) (court considered findings of fact as to terminated employee's job performance in state labor department's report on her eligibility for unemployment compensation). Under Pennsylvania law, "discharge ... for willful misconduct connected with ... work" disqualifies an employee from unemployment compensation. 43 Pa. Cons. Stat. Ann. § 802(e). The Pennsylvania Supreme Court has defined "willful misconduct" to mean "wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interest or of the employee's duties and obligations to the employer.*" McLean v. Unemployment Compensation Board of Review*, 476 Pa. 617, 383 A.2d 533, 535 (1978), quoting *Moyer v. Unemployment Compensation Bd*., 177 Pa. Super. 72, 110 A.2d 753, 754 (1955). *See also Rotto*, 1997 WL 689437 at * 5.

Id. at 518-19.

Here, Defendants contend that Plaintiff's act of touching Grgic inappropriately and then repeatedly lying about it constituted "willful misconduct" within the meaning of Pennsylvania's unemployment compensation statute and, therefore, was "gross misconduct" for purposes of the PHSA. Defendants cite several cases wherein courts have found that acts of dishonesty amount to "gross misconduct" under the PHSA or COBRA. *See, e.g., Larsen,* 154 F.3d at 96 (former state judge unlawfully procured controlled substances through the use of his subordinates); *Moore v. Williams College*, 414 F. App'x 307, 308-09 (1st Cir. 2011) (former college employee concealed and misrepresented his credentials during the period of employment at defendant college); *Burke v. American Stores Employee Benefit Plan*, 818 F. Supp. 1131, 1136-38 (N.D. Ill. 1993) (employee used improperly procured "saver stamps" to obtain free turkeys from employer's retail outlets); *Adkins v. United Int'l Investigative Servs., Inc.*, No. C 91-0087 BAC, 1993 WL 345186, at *4 (N.D. Cal. 1993) (former employee left post unattended and falsified records to receive additional paychecks); *Conery v. Bath Assocs.*, 803 F. Supp. 1388, 1396 (N.D. Ind. 1992) (allegations that employee misappropriated company funds, if true, would constitute "gross misconduct").

Here, Plaintiff's discharge was premised on his inappropriate touching of Grgic and his repeated denials of any inappropriate physical contact. Arbitrator Wolf found that Plaintiff had engaged in a "serious act of deception" by repeatedly denying the inappropriate contact with Grgic during the course of the IAD investigation. The Court agrees that, as a matter of law, these circumstances demonstrate a "wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has a right to expect of an employee, and/or negligence indicating an intentional disregard of the employer's interest or of the employee's duties and obligations to the employer" sufficient to establish willful misconduct. *McLean,* 383 A.2d at 535.

Plaintiff maintains, however, that there is at least a genuine issue of material fact concerning whether he engaged in "willful misconduct" because, following his discharge from PSP, he applied for and was awarded unemployment compensation benefits. Specifically, Plaintiff represents that the unemployment compensation office found that: "the incident which caused the separation was not sufficiently related in time to the date of the separation [over one (1) year]. As such, the separation cannot be said to have been caused by the rule violation and benefits must be allowed under section 402(e)." (PSAF ¶172.) In making this assertion of fact, Plaintiff purports to reference the unemployment compensation office's ruling, which he designates "Exhibit 39," but which does not appear in the record. Because the document is not part of the summary judgment record, this Court is unable to meaningfully interpret the import of the unemployment compensation ruling and its relevance to the "gross misconduct" inquiry.

In any event, however, the Court is not persuaded that a genuine issue of fact exists even if Plaintiff's representation is taken at face value. At most, Plaintiff's characterization of the ruling suggests at best that based on the temporal lag between the August 2009 incident and Plaintiff's November 2010 notice of termination, the unemployment compensation office may have been unwilling to infer that Plaintiff was discharged as a result of the underlying misconduct. *See* 43 P.S. §802(e) (stating that "[a]n employee shall be ineligible for compensation for any week ...[i]n which his unemployment is due to his discharge... for willful misconduct connected with his work..."). Thus, on its face, the unemployment compensation ruling relates only to the temporal aspect of Plaintiff's discharge; it says nothing to suggest that, substantively, Plaintiff's actions do not amount to "willful misconduct" within the meaning of

the statute.[31]  Because the Court is unable to conclude that a genuinely disputed issue of fact exists on this record concerning Plaintiff's "willful" and "gross" misconduct, Defendants' motion for summary judgment will be granted as to Count 4 of the FAC.[32]

## V.    CONCLUSION

For the reasons stated in this Opinion, Defendants' motion for summary judgment will be granted as to all counts in the Fourth Amended Complaint.[33]

---

[31] Under Pennsylvania law, factual findings in an unemployment compensation administrative proceeding are given no preclusive effect in subsequent civil litigation.  *See* 43 Pa. Stat. Ann. § 829 (West); *Mathis v. Christian Heating and Air Conditioning, Inc.*, 91 F. Supp. 3d 651, 657-58 (E.D. Pa. 2015); *Training Associates Corp. v. Unemployment Comp. Bd. of Review*, 101 A.3d 1225, 1234 (Pa. Commw. Ct. 2014).

[32] Defendants argue in the alternative that they are entitled to qualified immunity on Plaintiff's PHSA/COBRA claim, but this argument overlooks the fact that the only named Defendant in Count 4 is PSP.  Because the defense of qualified immunity is available only to defendants who are sued in their individual capacities for money damages, *see See Hafer v. Melo,* 502 U.S. 21, 25 (1991), the Court will not enter summary judgment on this basis.

[33] Also pending before the Court is the Motion of the Defendants for the "clawback" of what they identify as being the attorney notes of the PSP lawyers from the underlying arbitration, which they say are subject to the work product doctrine.  (ECF No. 89.) The Court previously ordered that the challenged materials be filed under seal. (ECF Nos. 79, 92.) The Court has examined them, and the parties have filed further briefs on the issue. The Defendants ask that the Court rule that the materials retained their protected status, and that they be returned to Defendants' counsel, and not be considered in ruling on the Motion for Summary Judgment. The Plaintiff asks that they be permitted to retain them, and that the Court consider them in conjunction with his response to the Motion for Summary Judgment.

First, the Court does not see how the materials have anything to do with the resolution of the Motion for Summary Judgment, and the Plaintiff does not really advise the Court as to the answer to that question. (ECF No. 89 at 1, n. 1.) Second, the Court has considered the arguments made by counsel in regard to these materials, and concludes that under Fed. R. Evid. 502(b), their disclosure was inadvertent and that provisions of Fed. R. Evid. 502(b) have been fulfilled. Because the documents are on the docket and thus available for appeal purposes, Plaintiff's counsel shall return to counsel for Defendants all copies of such materials in the possession of Plaintiff's counsel, the Plaintiff, and anyone else acting on behalf of the Plaintiff, and file a certification of such return on the docket within thirty (30) days of the date of this Opinion. Counsel for Defendants shall maintain custody of such returned documents until such as counsel is authorized to dispose of them by Order of this Court.

The core argument advanced by Plaintiff in opposition of the Defendants' explanation as to why the disclosure of the notes in discovery was inadvertent was the fact that the handwritten notes, which are of multiple pages,  in far-less-than-legible penmanship, bear the notation on one page "Tpr William Gilson-Cross" (which appears at the top of the eighth of twenty-five pages of such handwritten notes), and that they were referenced in the deposition of Mark Noce, at which time no one (the witness or the lawyers) seemed to know what they were.  (ECF No. 95.) Plaintiff then observes that it was not until eleven months after production (but only 3 weeks after that deposition) that the Defendants' counsel raised the clawback issue.

An appropriate Order will follow.

s/ Mark R. Hornak                    
Mark R. Hornak
United States District Judge

Dated:  March 30, 2016

cc: All Counsel of Record

---

First, as to inadvertence, it seems to the Court that Plaintiff cannot justly complain that it should have been plainly obvious to Defendants' counsel that these materials were protected work product when such was likewise not obvious to Plaintiff's lawyer. The trial lawyers in this case are highly experienced, savvy practitioners. While perhaps the Q&A format of some of the notes and the noted page header should have been some sort of tip-off of protected status, that was not obvious to any of the lawyers in the case.

Second, the Court is loath to get into the ins and outs of the mechanisms that the Commonwealth uses as to the resources it devotes to agency document review before materials are shipped off to the Office of Attorney General ("OAG"). Is it likely that with more eyes on the documents, this could have been caught? Maybe, but the Court does not conclude that the process used by the OAG and the PSP as to processing these documents was so unreasonable that Defendants should be treated as relinquishing the protected status of the documents. Finally, the Court believes that the Defendants' counsel acted with reasonable enough dispatch after the Noce deposition to seek the return of the documents, given the facially oblique nature of the materials. The Defendants' "clawback" Motions (ECF Nos. 60, 89) are granted.